Ronnie **EDNEY** (Rogers), Daryle Peters, Billy Campbell, and Florence Andes (Whitehead), Plaintiffs-Appellees,

v.

**LOCAL UNION 8024, UNITED STEELWORKERS OF AMERICA,** United Steelworkers of America International and James Reece, Defendants-Appellants.

Court of Appeals of Tennessee, Eastern Section.

Oct. 28, 1981.

Application for Permission to Appeal Denied by Supreme Court June 1, 1982.

William O. Shults, Newport, for Local Union 8024 and James Reece.

Robert H. Stropp, Jr., Birmingham, Ala., Richard W. Pectol, Johnson City, for Intern. Union.

Robert S. DeVane, Johnson City, John J. Fogarty, Springfield, Va., for plaintiffs-appellees.

## OPINION

GODDARD, Judge.

In this non-jury case which arose as a result of a labor dispute at Jarl Extrusions, Inc., of Elizabethton, Ronnie Edney Rogers, Daryle Peters, Billy Campbell and Florence Andes, now Whitehead, sued Local Union 8024, United Steelworkers of America and its president, Tony M. Taylor, United Steelworkers of America International and its staff representative, John Herron, and James Reece, a striking employee of Jarl, for various torts committed on their person and their property.

The Trial Court exonerated Mr. Taylor and Mr. Herron, found Mr. Reece liable to Mrs. Rogers and Mr. Peters, and both the Local and the International Unions liable to all Plaintiffs. He awarded the following damages: Mrs. Rogers—$3500 compensatory and $15,000 punitive; Mr. Peters—$25,000 compensatory and $15,000 punitive; Mr. Campbell—$25,000 compensatory and $15,000 punitive; Mrs. Whitehead—$3000 compensatory and $15,000 punitive.

The Local and International appeal, insisting that the evidence preponderates against any finding which would make them responsible for the acts of those inflicting the damages. Mr. Reece appeals, insisting (1) that the evidence preponderates against a finding that he committed any act resulting in injury either to Mrs. Rogers or Mr. Peters, and (2) that as to the Peters' claim, upon exclusion of hearsay evidence improperly admitted, there is no evidence that he participated in an assault upon Mr. Peters.

We will briefly detail the material facts relative to each Plaintiff's claim. Mrs. Rogers, who had been employed to replace a striking worker, testified that on August 6, 1979, when she was attempting to cross the picket line to enter the plant, Earl Harmon [1] struck her car with a sign, that on the same date as she was leaving the plant, six people, including Mr. Reece, threw rocks, striking her car. She continued down the road but was followed by Mr. Reece and his companion. On this occasion Mr. Reece threatened her with a rock.[2] About the first week of September, during the early morning hours, her car was shot into while parked at her residence. On September 12, when she was approaching her car preparatory to going to work, she was shot at, and several of the bullets struck her car. She was called ugly names on a number of occasions, and at least on one occasion was threatened with rape by an anonymous telephone caller. Mrs. Rogers was unable to identify any of the perpetrators of the acts, except as above noted.

Mr. Peters, who was employed by Jarl after the strike began, testified that he was beaten by several men at a market some distance from the Jarl plant. He could not identify the assailants, but heard one ask him during the altercation, "How do you like Jarl's now?"

Mrs. Whitehead testified that her car was damaged by an individual picketer who struck it with a sign. She was also called vulgar names when crossing the picket line, the tires of her car were flattened while it was in a parking lot of a local hospital, and on one occasion, while driving a car, she was followed by a car being driven by Danny Bullocks, a striking employee. She also testified that her car was struck by a slab of concrete as she passed a market on her way to work. She likewise was unable to identify the perpetrators of the acts, except as above noted.

Mr. Campbell, a former striker, had returned to work for two days in late September, but quit again because of the hostile reception by the employees then working in the plant. Sometime after he had quit work for the second time, a home owned by his mother-in-law in which he claimed an interest was set on fire and burned, damaging furnishings owned by him and his wife.

The proof relative to the liability of the Local and the International is somewhat conflicting. There is very little evidence that Mr. Taylor or Mr. Herron did anything to encourage violent acts. As a matter of fact, there is considerable evidence that Mr. Herron repeatedly warned the strikers that any violence would be counter-productive and the best way to win the strike was to withhold their labor. One of the witnesses so testifying was Mr. Campbell, himself a Plaintiff, a former Union member and a striker. There is some proof, much of which has little real probative value from which a contrary conclusion might be reached. This includes testimony that on one occasion a rally was being held in the hall of another union to show support for the striking Jarl workers, and that a member of another union made the statement that the only way to win the strike was to keep the workers out of the plant by any means. On this occasion both Mr. Taylor and Mr. Herron were present and neither responded. There is also the testimony by deposition of Tom Fletcher that weapons

---

1. Mr. Harmon was not sued and his relationship to the controversy is not shown. We infer, however, that he was a striking employee.

2. The size of the rock is not shown in the record, but was demonstrated to the Court.

were present in the tent near the picket line when Mr. Taylor and Mr. Herron were present, that Mr. Taylor passed out armored piercing ammunition, and that Mr. Herron on occasion had advised them regarding "getting scabs and stopping trucks." In addition, he said things such as "Be careful," "Don't get caught," and "Don't tell me these things. I'm not allowed to hear them." The Trial Court, however, obviously discredited this testimony[3] by finding that "neither of these gentlemen did any overt act, and the Court will have to say in all honesty, apparently tried their best to keep the members of the local union from engaging in violence."

■ The Trial Court, however, predicated liability in part upon the fact that the Local Union called the strike with the knowledge and consent of the International Union, and both had ratified the unlawful acts of the individual members by furnishing bonds, paying attorney fees and distributing strike funds. In all deference to the Trial Court, we do not believe this amounts to a ratification. As to the strike funds, it is common knowledge that they are distributed whether the strike be peaceful or violent, and as to the other acts, we note that, at least insofar as the bonds are concerned, the proof shows without contradiction they were only furnished in cases where the strikers disclaimed guilt. In the one instance where they admitted participation in some illegal act, bonds were not furnished.

■ The other predicate for liability was that Mr. Herron and Mr. Taylor failed "to control their membership." With further deference to the Trial Court, we do not believe they have such a duty. It seems to us if they make a good faith effort to try to control their membership (a fact found by the Court to be true), they have done all the law requires, and under such circumstances liability may not attach to them personally or to the organizations they represent.

**3.** Mr. Taylor did not testify. However, it would appear that the Court, upon accrediting the testimony of Mr. Herron, discredited that of

■ The testimony contended to be improperly admitted as hearsay was introduced after that of Ronnie Bradley, an eyewitness to the assault on Mr. Peters. Mr. Bradley had testified to the following facts:

(1) He observed the assault.
(2) He did not see any person in the courtroom who perpetrated it.
(3) He would recognize the person if he saw him.
(4) He reported the matter to the Elizabethton Police Department.
(5) He was not shown any photographs or asked to make any identification at the Police Department.
(6) He had never before seen the photograph which was shown to him at trial.
(7) The man on the right in the photograph was not one of the men that attacked Mr. Peters.

Thereafter, Tom Bowers of the Elizabethton Police Department testified as follows:

Q. Can you identify that photograph?

A. Yes, sir. That's the photograph shown to the witness, Ronnie Bradley.

Q. There are two people in the photograph, is that correct?

A. No, there's three people.

Q. Well, that's right. One's got his back turned. Do you know of your own knowledge who this gentleman standing on the right of the photograph is?

A. That's James Richard Reece.

Q. Did Mr. Bradley make any reference to that individual in the photograph?

MR. PECTOL: Your Honor, there's where again we . . .

THE COURT: I—I sustain the objection at that point.

Q. Did you show the photograph to Mr. Bradley?

A. Yes, sir.

Q. What did he do when you showed him the photograph?

MR. STROPP: Objection.

Mr. Fletcher implicating both Mr. Herron and Mr. Taylor.

MR. PECTOL: Same objection, Your Honor.

THE COURT: Overruled.

Q. What did...

A. He identified Mr. Reece as one of the assailants.

It is apparent that the statement attributed to Mr. Bradley, having been offered to prove the truth thereof, was hearsay and subject to exclusion unless it comes within one of this rule's myriad exceptions. Our research discloses no exception which would save the proof, nor has counsel for the Plaintiff suggested one. Indeed, this question is not even addressed in Mr. Peters' brief. We accordingly conclude the evidence was improperly admitted and must be excluded from our consideration. This results in there being no creditable evidence linking Mr. Reece to this altercation.

Before leaving this point, we recognize that there are some circumstances where the proof would be admissible to impeach the testimony of Mr. Bradley. However, even if it were admissible for this purpose it would not rise to the dignity of substantive evidence sufficient to support a judgment of liability.

We view the proof, however, as to Mrs. Rogers' claim in a different light. She specifically and unequivocally identified Mr. Reece as the man who threw rocks at her car and later threatened her. He denied involvement in either incident, but the Trial Court resolved this matter of credibility in her favor. As has often been said, in matters of credibility the Trial Court's evaluation is entitled to great weight. *State v. Mayor and Aldermen of the Town of Morristown*, 222 Tenn. 21, 431 S.W.2d 827 (1968); *Roberts v. Ray*, 45 Tenn.App. 280, 322 S.W.2d 435 (1958). Under the record before us we cannot say that the evidence preponderates against the Trial Court's findings.

In regard to damages, however, it does appear both compensatory and punitive should be adjusted. The Trial Judge obviously considered other acts for which he held the Local and International responsible in arriving at his award. Because we have held the Unions not liable, his award must be reduced. Under the whole record we believe a proper award for compensatory damages for the acts attributable to Mr. Reece is $1000, and for punitive damages $5000.

In conclusion, we are satisfied that there have been outrageous, reprehensible and, at times, cowardly acts committed against each of these Plaintiffs. We simply find that the proof does not show the responsible parties, except as already noted, and that the same standard must be used to adjudge liability regardless of how violent, unlawful and depraved the acts may have been.

For the foregoing reasons, the actions of all the Plaintiffs against the Unions are dismissed, as well as the action of Mr. Peters against Mr. Reece. The cause is remanded to the Circuit Court for Washington County for collection of the judgment of Mrs. Rogers, as modified, and the costs below, which are, as well as the costs here, adjudged one-half to the Plaintiffs and one-half to Mr. Reece and his surety.

PARROTT, P. J., and FRANKS, J., concur.