**333 A.2d 411.**

RALPH N. SWEET *et al. vs.* HEMINGWAY TRANSPORT, INC. *et al.*

MARCH 4, 1975.

PRESENT: Roberts, C. J., Paolino, Joslin, Kelleher and Doris, JJ.

KELLEHER, J. This negligence action which was tried before a Superior Court jury arose from a series of automobile collisions that occurred in Stonington, Connecticut in the southbound lanes of United States Interstate Route 95 at approximately 7:30 a.m. on February 10, 1968, at or near the Mystic Seaport exit ramp. A report made by the Connecticut State Police lists six vehicles as having been involved in the incident. During the trial, the operator of one of the vehicles who was not involved in this suit, when asked to describe the prevailing road and weather conditions replied, "treacherous, snowy, slippery." It is with that description in mind that we begin our consideration of this appeal.

The plaintiffs Ralph N. and Raymond L. Sweet are brothers. Ralph, who was driving Raymond's 1964 Chevrolet sedan, seeks damages for personal injuries. His brother sues for property damage. Ralph is before us on an appeal from the grant of a directed verdict in favor of defendants Hemingway Transport, Inc., the owner of a 1961 Mack tractor-trailer, and its driver Carl J. Manco. The Sweet brothers are appealing the grant of a new trial to defendants Helen Audette, the owner of a 1964 Volkswagen sedan, and its driver David Audette. Helen is David's mother. The defendant trucking company and its driver, Carl Manco, have taken an appeal from the trial justice's denial of their motion for a new trial on Raymond's property damage claim. Hereinafter, since the owners of the respective vehicles are responsible for the actions of the operators, we shall refer only to the drivers and then only by their last names. All of the parties to

this action, with the exception of the trucking company, are Rhode Islanders.

At the time of the collision Sweet worked as a "test mechanic" at the General Dynamics Corporation in Groton, Connecticut. On the day in question, when he left his home in Warwick, Rhode Island at around 6:15 a.m. to go to work, it was a nice day. As he made his way southerly along Route 95, the weather began to worsen. When he arrived at Stonington, Connecticut, he encountered a snow storm. Route 95 at that point is a divided highway. Three of its lanes are for southbound traffic. Its other three lanes channel the traffic northbound. A gulley which lies between the northbound and southbound lanes acts as a natural divider. The three southbound lanes are identified as a turnoff lane, a travel lane, and a passing lane. There is a 4-foot wide shoulder that runs alongside the turnoff lane and the passing lane.

As Sweet traveled south, he came to the top of a hill which is approximately one-half mile north of the Mystic exit ramp. There is a gentle slope as, after reaching the crest, one travels south. As Sweet began to come down the hill, he saw several automobiles in various states of disablement. Sweet was driving in the travel lane. To his immediate rear and proceeding along in the passing lane in the Volkswagen was Audette. Somewhere to Audette's rear was Manco who was driving the Mack tractor-trailer rig. As Sweet reached the midpoint of the slope, he noticed a green and yellow station wagon that was stopped partly in the turnoff lane and partly in the travel lane. The wagon had been involved in a collision with another car. Sweet, upon seeing the blockage in the driving lane, veered to his left and entered the passing lane in front of the Volkswagen.

Audette at this time was returning to duty at a nearby naval installation. His front-seat passenger was a sailor

named Michael McGinn. Audette, in an effort to slow down so that he would not come into contact with Sweet's Chevrolet, moved over onto the shoulder and rode the left side of his vehicle along a metal guardrail that stood ready to protect an errant vehicle from going down into the gulley. By riding the guardrail, Audette slowed his descent so that just before he came to a halt, he "nudged" the rear of the Chevrolet, causing it to go into a slide and finally come to rest in the travel lane with its front pointing in a somewhat northerly direction. Its left side was alongside the driver's side of a 1967 Buick station wagon.[1] The driver of the Buick testified that she was proceeding along in the turnoff lane with every intention of turning right onto the exit ramp. However, she skidded past the ramp and collided with the rear of a 1965 International tractor-trailer rig. The driver of the International tractor-trailer rig had come to a stop because a vehicle to its front had struck the abutment of a bridge that spanned the highway leading to Mystic. The sixth vehicle in this saga was David Snyder's 1968 Pontiac sedan. Snyder, like the operator of the International, had come to a halt because of a series of skidding collisions that had occurred somewhere just beyond the Mystic turnoff. Snyder was stopped in the passing lane.

As Manco, who was operating the Mack, came down the hill, he went into a skid. His rig "jackknifed." The tractor headed south-southwest, but the trailer swung into an east-west plane. When Sweet saw the jackknifing rig sliding down the road, he jumped out of the Chevrolet, ran to the westerly side of the highway, and climbed over a guardrail that ran alongside the turnoff lane shoulder. The tractor hit the Chevrolet, pushing it up against the

---

[1]There were two station wagons in the area, a green and yellow wagon that was half way up on the hill and the Buick that was disabled at the turnoff.

driver's side of the Buick wagon. Manco's tractor then hit the Pontiac while his trailer struck the Volkswagen sending it up against the easterly guardrail. The driver of the Buick station wagon said that all of the multiple mishaps occurred within a matter of seconds. Audette also maintained that after the trailer struck the Volkswagen, the Volkswagen bounced off the Chevrolet before coming to rest next to the guardrail.

The motorized but immobilized sextet made for a busy morning and the preparation of a rather lengthy accident report[2] by Trooper Don B. Rich, a member of the Connecticut State Police. The trooper who testified by way of a deposition described the road conditions at the scene of the collision as being "extremely slippery." Immediately after the various mishaps, Sweet had no reason to blame anyone but mother nature for his turn-around skid into the driving lane. It was only after the drivers had assembled in Sweet's car as they awaited the arrival of the police did Sweet hear Audette tell of the Volkswagen "nudge." It was at this point that Sweet became aware that the Volkswagen and the Chevrolet had been in contact with each other.

While during the 6-day trial counsel for all the litigants spent considerable time placing the six vehicles in their respective positions before and after the pileup had occurred, we see no need to repeat this testimony.

In considering the trial justice's grant of Audettes' motion for a new trial, we need only point out that the trial justice in deciding such a motion is dutybound to make an independent appraisal of the evidence. As he weighs the evidence and assesses credibility, he can pick and choose whom he will believe. Here, the trial justice placed great emphasis on the testimony of McGinn, the front-

---

[2]See appendix.

seat passenger in the Volkswagen. McGinn told how the Chevrolet "suddenly swerved" into the passing lane right in front of the Volkswagen and "cut us off." It was at this point that the passenger suggested to Audette that he "hit the guardrail" so that he could try to slow down and avoid striking the Chevrolet. The Volkswagen was almost stopped when it struck the other vehicle and, as McGinn stated, the contact was "barely enough to push him into a slide." The Volkswagen had come to a stop at that point and Manco's trailer swung by and gave it a jolt. The trial justice believed that the contact between the two cars was slight and that Audette's actions as he proceeded along the passing lane onto the shoulder to "ride the guardrail" could not be classified as negligence. Having in mind the road and weather conditions and Sweet's sudden swerve to the left, the trial justice felt that Audette had done everything that could be reasonably expected of him on the day and time in question.

The trial justice emphasized that he considered McGinn's testimony to be truly objective because he had no contact whatever with Audette during the 5 years that had elapsed between the collisions and the time of trial and impressed the trial justice as the one individual who could give a dispassionate recitation of who hit whom and how they hit on the frigid February morning in question. In placing great reliance upon McGinn's version of what occurred, the trial justice remarked that the passenger alone could give an undisturbed version of what went on as Audette followed Sweet down the hill past the turnoff, because McGinn could observe without being preoccupied as to how the vehicle should be driven.

The party appealing an adverse ruling on a motion for a new trial assumes the burden of convincing us that the trial justice in considering the motion overlooked or misconceived material evidence or was otherwise clearly

wrong. *Dawson* v. *Rhode Island Auditorium, Inc.,* 104 R. I. 116, 242 A.2d 407 (1968). While Sweet has argued with great vigor in this regard, he has not convinced us that the trial justice's granting of a new trial motion to the Audettes was erroneous.

As we consider the trial justice's direction of a verdict for Manco on Sweet's claim for personal injuries, it should be stressed that at the time the Mack struck the Chevrolet, Sweet was enjoying the sanctuary afforded by the area behind the westerly guardrail. Sweet's family physician testified that Sweet had received a strain of the neck and lower back, both of which, he said, were causally related to the "accident in question." The trial justice pointed out that the jury would have to speculate to allocate the injuries that were due to the Volkswagen and those caused by Manco's driving technique. The physician gave a lengthy reply in which he first indicated that "* * * the original impact[3] in the rear was consistent with the entire picture * * *." He then said, "* * * it is possible, it is probable that he strained his back in that manner * * *" as he hurried out of the car but "I feel that regardless [of the lower back strain] he had enough disability in the neck to justify" the entire 7-month period of his disability. He also disclosed that the "more important" injury was the neck and that it "certainly couldn't happen going out the door."

---

[3]In deciding Audettes' motion for a new trial, the trial justice remarked that even if Audette were negligent, the jury's award of $15,000 was grossly excessive. In making this determination, the trial justice alluded in part to the doctor's assumption that his patient's injuries were caused by a "severe impact" between the Volkswagen and the Chevrolet when the testimony showed a "nudge." The doctor testified that Sweet on his first visit told him that he had been "shaken up and thrown about" by the impact of the initial collision. Sweet had earlier denied giving such a statement to the physician. The trial justice would have ordered a remittitur of all funds in excess of $6,000.

It is well settled here in this state that when the only evidence offered to establish causal relationship between one person's activities and another's injuries is the testimony of a medical expert, such evidence must speak in terms of "probabilities" rather than "possibilities." *Suffoletta* v. *Ricci Drain Laying Co.*, 113 R. I. 114, 319 A.2d 19 (1974); *Taglianetti* v. *Jo-Dee Corp.*, 103 R. I. 552, 239 A.2d 192 (1968); *Woods* v. *Safeway System, Inc.*, 101 R. I. 343, 223 A.2d 347 (1966). Expert testimony, if it is to have any evidentiary value, must state with some degree of positiveness that a given state of affairs is the result of a given cause. Absolute certainty, of course, is not required. In those cases where expert testimony is relied on to show that out of several potential causes a given result came from one specific cause the expert must report that the result in question *"most probably"* came from the cause alleged. *Tabuteau* v. *London Guar. & Accident Co.*, 351 Pa. 183, 40 A.2d 396 (1945).

Here, the doctor's testimony as to what incident should be held accountable for Sweet's lower back ailment was so equivocal that it failed to provide the requisite evidentiary basis on which damages could be properly assessed against Manco. The doctor's failure to exclude what according to him was an equally plausible cause of Sweet's lower back complaints left no proper foundation for a finding of causal connection between Sweet's swift departure from the Chevrolet and his aching back.

We come now to Manco's appeal from the denial of his motion for a new trial on the property damage claim. The denial of Manco's motion for a new trial on the property damage phase of this episode needs little discussion. In denying this motion the trial justice dwelt at length on the issue of Manco's negligence. He found that prior to the jackknifing event Manco was driving at an excessive rate of speed given the travel conditions on that day and

the fact that the Mack tractor-trailer rig had a gross weight of 42,000 pounds. In fact, the trial justice specifically stated that had Manco been operating "at a slower speed coming down the hill, he would never have got to the Sweet vehicle when Audette and Sweet got into their vehicular altercations." When he denied Manco's motion, the trial justice granted a new trial on the property damage claim. The jury had awarded damages against Manco in the sum of $600 and damages against Audette in the sum of $105.[4] There had been expert testimony which provided a basis for a property damage award in the total amount of $705. The trial justice in awarding a new trial faulted the jury for ignoring his instructions which he said barred them from dividing the damages. The new trial grant was provisional in that if the additur were paid, the motion would be denied. The idea of an additur was rejected.

In his brief and argument on the new trial question, Manco expends all his energies on why he should not be forced to pay the additional $105. He utters not a thought or citation pointing to the trial justice's finding of his negligence. Consequently, his appeal on the denial of his motion for a new trial is denied, for he has failed to brief or argue the question of his negligence. Furthermore, he has taken no appeal on the grant of Raymond Sweet's motion for a new trial. Manco may have an additional 10 days after this opinion is filed to pay the additur, if he does not, a new trial will be held in which, so far as Manco is concerned, the only issue will be the amount of property damage for which he is responsible.

---

[4] We note that the papers which we have before us are inconsistent as regards the amount of damages awarded against Audette. The judgment entered after the jury verdict lists the sum of $100, and the trial justice's order in directing an additur uses the figure of $105. This discrepancy is a matter to be resolved in the trial court.

The respective appeals of Ralph N. Sweet, Raymond L. Sweet, Hemingway Transport, Inc., and Carl J. Manco are hereby denied and dismissed.

### Appendix

This sketch which is part of the police report gives some indication of the post-collision positions of the vehicles that came to rest in the area near the exit ramp.

Legend:

| | |
|---|---|
| Vehicle #1 | The International Tractor-Trailer Rig |
| Vehicle #2 | The Buick Station Wagon |
| Vehicle #3 | The Chevrolet Sedan |
| Vehicle #4 | The Mack Tractor-Trailer Rig |
| Vehicle #5 | The Pontiac Sedan |
| Vehicle #6 | The Volkswagen Sedan |

*Higgins & Slattery, John A. Baglini,* for plaintiffs.

*Gunning, LaFazia, Gnys & Selya, Richard T. Linn,* for Hemingway Transport, Inc. and Carl J. Manco; *Hanson,*

*Curran, Bowen & Parks, Kenneth R. Neal, David P. Whitman,* for David L. Audette and Helen Audette, for defendants.