Edward T. MURPHY

v.

**UNITED STEELWORKERS OF AMERICA LOCAL NO. 5705, AFL–CIO. Drapeau et al.**

No. 83–422–Appeal.

Supreme Court of Rhode Island.
April 18, 1986.

William Y. Chaika, Chaika & Loffredo, Cranston, for plaintiff.

Richard M. Peirce, Roberts, Carroll, Feldstein & Tucker, Providence, for defendants.

## OPINION

KELLEHER, Justice.

On September 1, 1974, more than 500 production employees of the Washburn Wire Company plant located in East Providence were on strike. The strikers, who were members of local No. 5705 of the United Steelworkers of America, AFL–CIO, had set up a picket line in front of the Bourne Avenue entrance to Washburn's plant. The plaintiff, Edward T. Murphy, was director of plant safety and part of the management team. Once the strike began, he worked six days a week, twelve hours a day, as a crane operator. Hereafter we shall refer to the plaintiff as "Murphy" and to the defendant as "the local."

Approximately a month after the strike began, Murphy drove to the plant prepared to work a twelve-hour shift beginning at 7 p.m. Once Murphy had traveled about twenty feet along Bourne Avenue, his car was surrounded by "probably one hundred" pickets. Murphy told the jury that one member of local No. 5705, Charles D. Souza by name, approached the driver's side of his vehicle. According to Murphy, Souza came running toward the car, holding a small boulder about ten inches in diameter over his head. Souza threw the rock through the side window closest to Murphy, whereupon the rock struck him on the side of the head. Murphy managed to drive his vehicle inside the plant's gate

near a security shack, and as he pulled to a stop, he lost consciousness. A rescue vehicle was called, and Murphy was taken to Pawtucket Memorial Hospital where he was treated and then released.

He described the severe headaches he experienced as feeling "like a hot poker going down." The headaches continued all through the summer of 1975. Within a few days of this confrontation with Souza, he noticed a loss of peripheral vision in his right eye. He described the loss as the same type of loss he suffered in 1965 before surgeons repaired a detached retina.

Other violent episodes were described. The plant's general manager testified that on one occasion when he drove through the picket line with a truck, two mirrors were broken and the windshield was cracked by the picketers. On another occasion a picketer jumped onto the hood of his car, and the windows were broken. A purchasing agent who during the strike was in charge of Washburn's trucking said that several times when a truck entered the plant, some type of violence occurred. "They broke off a mirror, put a stone through the windshield, threw two-by-fours with nails on them under the wheels." Testimony was also elicited indicating that the local's members on the picket line used a walkie-talkie and appeared to call for reinforcements from a nearby union hall whenever trucks were observed leaving or arriving at Washburn's premises.

The local's president testified that during the strike he had "as much control as any officer could have" over members. He specifically denied any knowledge that tires of automobiles crossing the picket line were slashed or that the vehicles were scraped or struck. He said he often warned the members against using violence, explaining that "[w]e had five hundred and eighty-five people, a long strike, it's pretty hard to control, and I think we certainly got the message across to a good many of the people. Once in a while, especially the younger crowd, would like to kick a hubcap or something."

The jury, after listening to the evidence, returned a verdict for Murphy, awarding him $13,000 compensatory damages and $150,000 punitive damages. The local has appealed, and Murphy has filed a cross-appeal. We reverse, and the discussion that will follow will concern (1) the trial justice's charge to the jury as it relates to the local's responsibility for the actions of its members, (2) Murphy's eye injury, and (3) the refusal by the trial justice to apply Rhode Island's prejudgment-interest statute to the punitive-damages award.

■ As a general rule, under state law a labor union may be liable for the tortious conduct of its officers or members during the course of a strike only if the union authorized, participated, or ratified the tortious acts. *International Union of Operating Engineers v. Long*, 362 So.2d 987, 989 (Fla. 3rd Dist.Ct.App.1978). *Cf. Rochdale Village, Inc. v. Beverly*, 96 Misc.2d 1080, 410 N.Y.S.2d 508 (1978); *Edney v. Local Union 8024, United Steelworkers of America*, 636 S.W.2d 711 (Tenn.Ct.App. 1981). *See also* Annot., 36 A.L.R.3d 412, § 3 (1971).

These rulings reflect general principles of agency and as such appear to be less restrictive than the federal standards for union liability under 29 U.S.C.A. § 106 (1973), which requires "clear proof" of actual authorization, participation, or ratification of the tortious acts of individual officers or members by the union. *Cf. Charles D. Bonanno Linen Service, Inc. v. McCarthy*, 708 F.2d 1, 11–12 (1st Cir. 1983).

■ In his instructions to the jury relative to the local's responsibility for the violence that took place on the picket line, the trial justice embodied the principles to which we have earlier alluded, but he also told the jury that the local could be found liable for unauthorized or forbidden acts of its agents if the acts could be deemed to be incidental to the performance of a duty that the agent or servant was authorized to perform. In adding this statement, the

trial justice was obviously relying on *Bryce v. Jackson Diner's Corp.*, 80 R.I. 327, 331, 96 A.2d 637, 639 (1953). Even though this is an acknowledged statement of the law of agency, it is not controlling as this court attempts to determine the liability of a labor union for the tortious acts of its individual members.

■ The trial justice's broad theory of agency in the circumstances before us was prejudicial error. It is conceivable that on the facts of this case a jury could have found that the local had authorized or ratified the acts of Souza[1] and others, but because we are in doubt about the exact basis for the jury finding of liability, it is necessary that a new trial be held.

One issue in dispute at trial was Murphy's claim for damages for loss of peripheral vision in his right eye. In 1965 Murphy underwent surgery for a detached retina in his right eye. The ophthalmologist who nine years later treated Murphy after the rock-throwing incident told the jury that his examination of Murphy indicated that the eyes seemed "a little bruised, but the retina operation was still in good shape." The ophthalmologist referred Murphy to the surgeons who had performed the 1965 operation. They then placed "a little bit more material" in the same area. The ophthalmologist emphasized that Murphy's loss of peripheral vision could have resulted from a blow to his head, but there were other possible causes, including scarring from the retina operation. This witness was unable to say with a degree of reasonable medical certainty that Murphy's 1974 loss of eyesight was due to his confrontation with Souza at the entrance to Washburn's plant.

In his charge the trial justice acknowledged that the ophthalmologist failed to

link Murphy's loss of peripheral vision with Souza's rock but then told the jury it could consider other nonexpert testimony presented at trial to establish the requisite causation.[2] In taking this position, the trial justice relied on a portion of an observation made by this court in *Sweet v. Hemingway Transport, Inc.*, 114 R.I. 348, 355, 333 A.2d 411, 415 (1975), as well as the conclusion reached in *Valente v. Bourne Mills*, 77 R.I. 274, 75 A.2d 191 (1950). In *Sweet* this court, in commenting on the equivocal testimony of Sweet's family physician who in one breath spoke in terms of "possibility" and "probability," said, "It is well settled here in this state that when the only evidence offered to establish causal relationship between one person's activities and another's injuries is the testimony of a medical expert, such evidence must speak in terms of 'probabilities' rather than 'possibilities.'" 114 R.I. at 355, 333 A.2d at 415. We commend the trial justice's keen vision and acknowledge the inadvertent presence of a phrase that would indicate that the necessity for proving a causal relationship between one's negligence and another's injuries by expert testimony applies only when there is no other testimony to support the proof of causation. Understandably, the trial justice obviously thought so. The inadvertence in *Sweet* was not only unfortunate, it was also erroneous.

■ Expert testimony, we have said, is required whenever the subject matter of the inquiry is one involving special skills that are beyond the ken of an average person; but if all the facts and circumstances can be accurately described to a jury and if the jury is capable of comprehending and understanding such facts and drawing certain conclusions from them, as

1. Although Murphy named Souza as a defendant, apparently he was never served, and Murphy has not pursued his claim as it related to Souza.

2. The trial justice had in mind testimony elicited from an optometrist who had evaluated Murphy's visual acuity in June 1971. The optometrist testified in direct examination that at no time during the period of the evaluation did Murphy complain about any loss of peripheral vision in his right eye. The trial justice was of the belief that the jury could consider this silence as evidence that the detached retina played no part in Murphy's 1974 sight problem.

was the expert, then there is no necessity for expert testimony. *Zawatsky v. Cohen*, 463 A.2d 210, 212 (R.I.1983); *Allen v. State*, 420 A.2d 70, 73 (R.I.1980); *Barenbaum v. Richardson*, 114 R.I. 87, 93, 328 A.2d 731, 734 (1974). We have no hesitancy whatsoever in holding that the issue of Murphy's loss of peripheral vision was beyond the ken of the jury and was of such a nature that the factfinders required the assistance of an expert.

Furthermore, the trial justice's reliance on *Valente* is misplaced. In *Valente* this court upheld the award of compensation to an employee because of the removal of her left breast that some weeks earlier had been struck by a falling bobbin. The employee prevailed even though she had not presented any direct medical testimony that the injury necessitating the removal was related to the bobbin incident. However, the court in *Valente*, 77 R.I. at 281, 75 A.2d at 195, stressed:

"The undisputed evidence before us is that, with the exceptions hereinbefore noted, the petitioner had enjoyed good health for almost thirty-four years prior to the accident, and that at no time before such occurrence did she have any trouble whatever with her breast or any bodily part connected therewith. Furthermore, the injury manifested itself at the very situs where force was applied by the falling bobbin * * *."

Here, it is undisputed that (1) Murphy had in the past suffered from a detached retina and the loss of peripheral vision in the same eye for which he had sought compensation before the jury and (2) the situs where the force was applied by Souza was on the left side of the head rather than on the right side.

Murphy in his cross-appeal has raised an issue that in light of the necessity of retrial becomes quite significant. Thus, it is appropriate that we review the trial justice's

refusal to apply the prejudgment-interest statute, to wit, G.L.1956 (1985 Reenactment) § 9–21–10, to the jury's award of $150,000 in punitive damages.

██ We are reminded that § 9–21–10 calls for the imposition of interest in any "civil action" in which a verdict or a decision awards "pecuniary damages." There are three recognized categories of damages; they are compensatory, punitive, or nominal damages. Compensatory damages are awarded to a person in satisfaction of or in response to a loss or injury sustained. *Proffitt v. Ricci*, 463 A.2d 514, 517 (R.I. 1983). Recently, in *Greater Providence Deposit Corp. v. Jenison*, 485 A.2d 1242, 1245 (R.I.1984), we emphasized that punitive damages are awarded to punish the defendant and to deter any future misconduct rather than to compensate the plaintiff. Nominal damages are awarded where it is clear that the plaintiff has sustained a loss but has failed to present evidence upon which a factfinder could ascertain the damages sustained by the plaintiff. *Zuccaro v. Frenze*, 76 R.I. 391, 394, 71 A.2d 277, 278 (1950). We have no doubt that the Legislature, in employing the term "pecuniary," was using it as a synonym for "compensatory.[3] Again, in *Rhode Island Turnpike & Bridge Authority v. Bethlehem Steel Corp.*, 446 A.2d 752, 757 (R.I.1982), in upholding the constitutionality of our prejudgment-interest statute, we noted that the statute serves two purposes: it promotes early settlements, and more importantly, it compensates persons for the loss of use of money that was rightfully theirs. Consequently, it is our belief that § 9–21–10 was never intended to encompass an award of either punitive or nominal damages.

The defendant's appeal is sustained, the plaintiff's cross-appeal is denied, the judgment entered in favor of Murphy is vacat-

**3.** In 1897 the jury in the State of Washington had legislative authorization to award " 'damages, pecuniary or exemplary, as under all circumstances of the case may to them seem just.' " *See Walker v. McNeill*, 17 Wash. 582, 593, 50 P. 518, 521 (1897). Today, the term "exemplary" has been replaced by the word "punitive."

ed, and the case is remanded to the Superior Court for a new trial.