Montee DEBAR et al.

v.

WOMEN AND INFANTS
HOSPITAL et al.

No. 99–91–Appeal.

Supreme Court of Rhode Island.

Nov. 29, 2000.

 

Mark H. Grimm, Providence, for Plaintiff.

David W. Carroll, Timothy P. Gallogly, Providence, for Defendant.

Present: WEISBERGER, C.J., and LEDERBERG, BOURCIER, and GOLDBERG, JJ.

## OPINION

BOURCIER, Justice.

This case comes before us on appeal following entry of judgment as a matter of law in favor of the defendants in a Superior Court medical malpractice and wrongful death action.

In December 1991, Flexman Johnson and Montee Debar (plaintiffs) filed a civil action against Women and Infants Hospital and several of its physicians (defendants), alleging their negligence in failing to order a timely cesarean section to have caused the death of their infant.[1] All the physicians named in the complaint specialized in obstetrics and gynecology and treated plaintiff Debar during the final stages of her pregnancy. In October 1998, a Superior Court justice granted the defendants' Super.R.Civ.P. 50 motion for judgment as a matter of law after excluding the testimony of one of the plaintiff's expert witnesses.

On appeal, the plaintiffs assert that the trial justice abused his discretion in (1) excluding the testimony of their expert witness on causation, (2) denying their motion to reopen *voir dire* of the expert witness, (3) denying their motion to continue the case, (4) denying their motion to stay the decision excluding the expert testimony pending an appeal, and (5) denying their motion for a new trial. For the reasons hereinafter set out, we reverse, vacate the judgment and order a new trial.

## I

### Facts and Case Travel

On the afternoon of June 5, 1989, plaintiff Debar, almost forty two weeks pregnant and suffering from gestational diabetes, went to the defendant Women and Infants Hospital for an ultrasound. The ultrasound revealed diminished amniotic fluid in the amniotic sac, which may lead to decelerations in the fetal heart rate and to a decrease in oxygen flow to the fetus. Such a decrease in oxygen may in turn cause asphyxia, leading the fetus to gasp for air. This gasping for air is said to cause aspiration of meconium[2] into the fetus's lungs, which if not expelled can prevent breathing and ultimately lead to cardiac arrest. The plaintiff Debar subsequently was admitted to the hospital's emergency room.

Following a decision to induce labor, the plaintiff Debar's fetus in fact suffered from decelerations in its heart rate. From 4:30 p.m. on the day of her admission and into the following morning, a fetal heart rate monitor strip recorded decelerations in the fetal heart rate. By 3:50 a.m., the defendants observed thick meconium present in the fetus. From approximately 6:45 a.m. to 7 a.m., the fetus suffered more severe decelerations. Despite these decelerations and the presence of meconium, the defendants elected not to order a cesarean section. Instead, a blood sample was ordered

---

1. Doctor Marshall Carpenter, Dr. Cynthia Hanna, Dr. Marion Pandiscio, Dr. Mark Scott, and Dr. Martin Schoenmaker all were named in the original complaint. Doctor Scott and Dr. Schoenmaker settled prior to trial.

2. "Meconium" is commonly described as a fetus's first bowel movement.

taken from the fetus's scalp to determine whether the fetus remained at risk for meconium aspiration.[3] The blood sample revealed the fetus's pH level to be within normal range. The defendants subsequently ordered an amnioinfusion[4] to reduce the risk of further decelerations.

Despite the efforts of the defendants, at approximately 7:40 a.m. and 8 a.m., the fetus suffered severe decelerations. After this last series of decelerations, the defendants finally ordered a cesarean section at 8:15 a.m. On delivery by cesarean section at 8:38 a.m., the baby was found to have aspirated meconium into her lungs. The baby was pronounced dead approximately thirty-seven minutes after delivery. An autopsy determined that the cause of death was cardiac arrest as a result of meconium aspiration syndrome and bilateral pneumothoraces.[5]

During trial, the plaintiffs had introduced the testimony of Dr. Thomas Barden, who testified that the defendants had deviated from the accepted standard of medical care in failing to perform a cesarean section at or about the time of the 6:45 a.m. decelerations. He testified that he believed that if a cesarean section had been performed at that time the baby would have survived this episode "long enough that at least it would be sustainable." Nevertheless, he opined that "whether [the infant] may have eventually died as a result of the consequences of the disease is not something that I should try to answer, because I'm not a pediatrician."

To supplement the testimony of Dr. Barden and prove causation, the plaintiffs intended to rely exclusively upon the testimony of Dr. Daniel Adler, a board-certified pediatrician and pediatric neurologist. Doctor Adler was prepared to testify that had a cesarean section been ordered and

performed at or about the same time of the 6:45 a.m. decelerations, the Debar fetus would have survived. He proposed to testify that after the 6:45 a.m. decelerations, the fetus aspirated substantial amounts of meconium into her lungs, particularly between 8 a.m. to 8:15 a.m.

At trial, Dr. Adler testified before the jury. He related that he was a graduate of the Albert Einstein College of Medicine (AECM) and had completed a pediatric residency at the Columbia–Presbyterian Medical Center, during which he treated newborns stricken with meconium aspiration syndrome. He also testified that he later completed a fellowship in pediatric neurology, during which he treated newborns in AECM's intensive care unit. Later, as a faculty member at AECM, Dr. Adler focused primarily on pathology. Subsequently, he was retained by a community hospital, doing the bulk of his work in pediatric epilepsy and in the community hospital's newborn intensive care unit. He testified that he had been retained as a consultant in numerous cases involving children with neurological problems arising from birth complications, usually caused by asphyxia.

Doctor Adler further testified that in the course of his experience, he had frequently reviewed "every piece of data" from pathology reports to obstetrical records in treating newborns with birth defects. As part of this analysis, Dr. Adler often interpreted fetal heart monitor strips, pathology slides, and fetal scalp pH levels. When plaintiffs' counsel sought to elicit the doctor's opinion about whether the defendants' failure to undertake an earlier cesarean delivery was a proximate cause of infant Debar's death, the defendants objected to Dr. Adler's proffered testimony on the ground that he lacked the requisite qualifications to offer an opinion on causa-

**3.** A "fetal scalp pH" measures a fetus's acid base status, which may indicate whether asphyxia has occurred.

**4.** An "amnioinfusion" is a procedure that replenishes amniotic fluid in the amniotic sac.

**5.** "Bilateral pneumothoraces" is a condition in which the lungs collapse.

tion, and requested to *voir dire* the doctor. During the *voir dire,* Dr. Adler acknowledged that he did not consider himself an expert in the specialty of fetal monitoring or obstetrics.

Upon completion of the *voir dire,* the defendants objected to the doctor's being permitted to testify about the cause of infant Debar's death. Of his own accord, the trial justice then offered the following commentary:

"I'm concerned with the overlap of the specialty of obstetrics and GYN with pediatrics. * * * I can understand the pediatrician saying that he would like very much to understand something about the fetal life of the baby, but in matters that relate to the discipline of obstetrics, the pediatrician will usually defer—and I think this witness has indicated that he defers to the obstetrician."

The trial justice later concluded:

"I think there is going to be and is an issue in this case concerning meconium, when it was aspirated * * *. This condition, it seems to the Court to be far afield of this doctor's expertise. I'm not concerned by the label of pediatric neurology, but I noticed in reviewing with the court reporter that the doctor answered that he's not really involved in the delivery of the babies, but he takes over after that."

The trial justice then sustained the defendants' objection to the proposed causation opinion from the doctor. The plaintiffs' counsel then proceeded to make an extended offer of proof about Dr. Adler's proposed opinion testimony, which the trial justice rejected.

The plaintiffs' counsel thereafter immediately moved (1) to reopen the *voir dire* concerning Dr. Adler's qualifications, (2) to continue the case, allowing the plaintiffs an opportunity to retain a new expert, and (3) to stay the case pending appeal of the trial justice's ruling, all of which were denied. The trial justice then entertained and granted the defendants' Rule 50 motion for judgment as a matter of law. The

plaintiffs then filed a motion for a new trial pursuant to Rule 59 of the Superior Court Rules of Civil Procedure, citing as reason the error of the trial justice in excluding Dr. Adler's proposed testimony. The trial justice denied the motion for a new trial. In doing so, he noted that allowing Dr. Adler's opinion testimony would be tantamount to permitting a pediatric neurologist "to make a determination which required a skillful interpretation of obstetrical data" and "to do nothing but speculate on the question of causation."

## II

### Exclusion of Dr. Adler's Testimony

The plaintiffs assert here on appeal that the trial justice abused his discretion by excluding Dr. Adler's testimony on an "intractable assumption" that Dr. Adler was not qualified to determine whether an earlier cesarean section would have saved the baby's life because such an opinion required an interpretation of obstetrical data and that Dr. Adler was not an obstetrician.

■ The determination of whether to qualify and permit an expert witness to proffer an expert opinion relative to an issue in dispute is left to the discretion of the trial justice and this Court will not disturb that determination absent clear error or an abuse of that discretion. *See Sheeley v. Memorial Hospital,* 710 A.2d 161, 164 (R.I.1998); *Richardson v. Fuchs,* 523 A.2d 445, 447 (R.I.1987). Nevertheless, as this Court has also opined,

"To say, however, that the question is addressed to the trial justice's discretion does not mean that his ruling is not reviewable. What it does mean is that the ruling will be sustained provided the discretion has been soundly and judicially exercised, that is, if it has been exercised in the light of reason applied to all the facts and with a view to the rights of all the parties to the action, * * * and not arbitrarily or wilfully, but with just

regard to what is right and equitable under the circumstances and the law." *DeBartolo v. DiBattista,* 117 R.I. 349, 353, 367 A.2d 701, 703 (1976).

The state legislature, it must be noted, has enacted legislation purporting to curtail a trial justice's discretion in admitting expert testimony in medical malpractice actions. *See* G.L.1956 § 9–19–41. Section 9–19–41 provides,

> "In any legal action based upon a cause of action arising on or after January 1, 1987, for personal injury or wrongful death filed against a licensed physician, hospital, clinic, health maintenance organization, professional service corporation providing health care services, dentists, or dental hygienist based on professional negligence, only those persons who by knowledge, skill, experience, training, or education qualify as experts in the field of the alleged malpractice shall be permitted to give expert testimony as to the alleged malpractice."

In interpreting § 9–19–41, this Court has reasoned that the wording employed in the statute does not require that an expert must *practice* in the same specialty as the defendant to testify about the requisite standard of care. *Buja v. Morningstar,* 688 A.2d 817, 819 (R.I.1997) (per curiam); *Marshall v. Medical Associates of Rhode Island, Inc.,* 677 A.2d 425, 426 (R.I.1996) (per curiam). We had said earlier, in *Buja,* 688 A.2d at 819, that,

> "There is nothing in the plain and unambiguous language of § 9–19–41 that requires that before an expert testifies in a medical malpractice case, he or she must not only be an expert in the field where the alleged malpractice occurred, but must also practice in the same specialty as the defendant. Such an additional requirement is unnecessary and is in contravention to the General Assembly's clear intentions, as expressed in § 9–19–41."

In *Marshall,* 677 A.2d at 426, we also had noted that the statute does not suggest that to qualify as an expert witness, the testifying doctor must be board certified or otherwise have training in the same medical specialty as the defendant-physician.

Accordingly, this Court has rejected the contention that § 9–19–41 permits only an expert whose formal specialty is the same as that of a defendant-physician or whose specialty is precisely related to the medical issue in the case to offer an opinion on the appropriate standard of care. *See, e.g., Sheeley,* 710 A.2d at 165; *Buja,* 688 A.2d at 819. Indeed, in *Sheeley,* 710 A.2d at 165, we held that a board-certified obstetrician and gynecologist was competent and qualified to proffer an opinion about the standard of care for performance of a delivery procedure by a family medical doctor. In *Buja,* 688 A.2d at 818–19, we likewise concluded that an obstetrician could testify and give expert opinion in litigation against a family practitioner whose patient had given birth to an infant with birth defects caused by oxygen deprivation. In *Marshall,* 677 A.2d at 426–27, we had earlier vacated a directed verdict precipitated by the trial justice's preclusion of an opinion by a pediatric and family medical doctor about the standard of care for an emergency room doctor and internist in treating an animal-bite wound.

Rule 702 of the Rhode Island Rules of Evidence also repudiates the notion that an expert witness must have the exact formal certifications as the defendant to proffer opinion testimony. Rather, Rule 702 states, "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of fact or opinion." In *Flanagan v. Wesselhoeft,* 712 A.2d 365, 369 (R.I.1998), a trial justice granted the defendant's motion in limine to prevent the introduction of expert testimony based upon the alleged inability of the expert to testify in regard to his knowledge of the standard of care for pediatric surgeons

practicing in Rhode Island.[6] In reversing, we reasoned that an out-of-state board-certified pediatric surgeon should have been allowed to offer his opinion on the standard of care for a cervical node excision performed by an instate pediatric surgeon because both the doctor's board certifications and his "extensive knowledge, skill, and experience" in pediatric surgery should have presumptively permitted his testimony to be admitted at trial. Similarly, in *Gallucci v. Humbyrd*, 709 A.2d 1059, 1064–65 (R.I.1998), in the context of Rule 702, this Court determined that a board-certified orthopedic surgeon was competent and qualified to proffer an opinion about the standard of care for rehabilitative therapy performed by a physical therapist.

Other courts have likewise seen fit to reject the contention made here by the defendants that a medical professional must possess the same formal certifications as a defendant to give expert opinion in a medical malpractice case. *See, e.g., Pool v. Bell*, 209 Conn. 536, 551 A.2d 1254, 1258 (1989); *Fitzmaurice v. Flynn*, 167 Conn. 609, 356 A.2d 887, 892 (1975); *Letch v. Daniels*, 401 Mass. 65, 514 N.E.2d 675, 677 (1987). In *Pool*, 551 A.2d at 1258, the Supreme Court of Connecticut held that a neurologist could testify and proffer an expert opinion on the duty of care required of a general surgeon in a medical malpractice action. In *Fitzmaurice*, 356 A.2d at 892, the Supreme Court of Connecticut also ruled that it was error for the trial court to exclude the proffered expert testimony of a surgeon specializing in breast cancer surgery about the standard of care for an obstetrician and gynecologist in diagnosing breast cancer. The Massachusetts Supreme Judicial Court, in *Letch*, 514 N.E.2d at 677, also held that an orthodontist could testify and proffer an opinion in a medical malpractice case involving a pedodontist.

Accordingly, we have construed the wording of § 9–19–41 and Rule 702 both literally and liberally as intending to require only that the proffered expert possess adequate knowledge, skill, experience, or education in the same field as the alleged malpractice. *See Flanagan*, 712 A.2d at 369; *Sheeley*, 710 A.2d at 165. In defining what constitutes the "field" of alleged malpractice, this Court has looked largely to the nature of the patient's injury or to the nature of the procedure employed rather than to rigid classifications based solely on specialty certification. In *Sheeley*, we explained:

"The appropriate standard of care to be utilized in any given procedure should not be compartmentalized by a physician's area of professional specialization or certification. On the contrary, we believe the focus in any medical malpractice case should be the procedure performed and the question of whether it was executed in conformity with the recognized standard of care, the primary concern being whether the treatment was administered in a reasonable manner. Any doctor with knowledge of or familiarity with the procedure, acquired through experience, observation, association, or education, is competent to testify concerning the requisite standard of care and whether the care in any given case deviated from that standard." *Sheeley*, 710 A.2d at 166.

Accordingly, this Court has consistently held that an expert's testimony on the appropriate standard of care must be admitted when the witness possesses prerequisite prior experience in the field of the alleged malpractice, regardless of his or her formal specialty or certifications. *See, e.g., Sheeley*, 710 A.2d at 166; *Buja*, 688 A.2d at 819. We have reasoned that an expert's lack of formal certification may go to the weight to be given the expert's opinion by the fact finder rather than to its

**6.** At the time of the trial justice's decision in *Flanagan v. Wesselhoeft*, 712 A.2d 365 (R.I. 1998), the same or similar community standard of care test applied in medical malpractice cases.

admissibility and a trial justice should not bar such testimony *ab initio*. *See Buja*, 688 A.2d at 819 (citing *Marshall*, 677 A.2d at 426–27).

■ In so doing we of course continue to require that any proffered expert witness must still first demonstrate to the trial justice his or her particular knowledge acquired through education or experience in the field of alleged malpractice. *See, e.g., Buja*, 688 A.2d at 819. As we noted in *Marshall*, 677 A.2d at 427, this Court requires that the "proponent of [expert testimony] must still show the trial court that the so-called expert-witness has knowledge, skill, training, or experience in the same field as the alleged malpractice so that the expert's testimony can be genuinely helpful to the jury." We believe, as aptly noted by the Supreme Court of Connecticut in *Fitzmaurice*, 356 A.2d at 892, that:

> "Recognizing the complexity of knowledge required in the various medical specialties, more than a casual familiarity with the specialty of the defendant physician is required. The witness must demonstrate a knowledge acquired from experience or study of the standards of the specialty of the defendant physician sufficient to enable him to give an expert opinion as to the conformity of the defendant's conduct to those particular standards, and not to the standards of the witness' particular specialty if it differs from that of the defendant."

Although this Court has primarily considered the question of whether a proposed expert witness formally trained in a different specialty other than that of the defendant may testify in the context of evaluating the appropriate standard of care in a given case, we discern no reason to adopt a different rule when that same expert is expected to testify regarding causation.

In this case, we conclude that the trial justice erroneously evaluated the competency of Dr. Adler as an expert based solely on the doctor's formal certifications and specialties. A review of Dr. Adler's otherwise knowledge, skill, experience, and education in the field of the alleged malpractice—meconium aspiration syndrome in fetuses and infants—clearly demonstrates that he was certainly qualified to give his opinion on the issue of causation. He had testified to having more than adequate qualifications to ascertain and proffer his opinion about whether an earlier performance of a cesarean section would have prevented or mitigated meconium aspiration, which might have saved the life of the plaintiffs' infant. That testimony revealed that the "bulk" of his current work involved treating newborns in the intensive care unit at a community hospital. He indicated that he had treated numbers of newborns stricken with meconium aspiration syndrome and that most of his consulting practice involved children born with birth injuries resulting from asphyxia. Although defense counsel argued persuasively that Dr. Adler could not ascertain precisely when the fetus's periods of asphyxia began or came to an end, the trial justice overlooked Dr. Adler's considerable past experience in reading and interpreting fetal heart monitoring strips and fetal pH readings in connection with determining the onset and nature of neurological injury. Such experience certainly should have permitted the doctor to determine and opine when, in his opinion, the decelerations generally occurred and when a change in the fetus's acid base status transpired and, consequently, to determine from that point in time when the fetus was at risk because of a decrease in oxygen flow.

Although the trial justice expressed his apparent concern that a pediatrician would be unable to understand the fetal life of a baby and would usually defer to an obstetrician on such matters, a board-certified pediatrician by definition most certainly would possess adequate general knowledge to comprehend the fetus's development *in utero* in order to treat a newborn. Dr. Adler testified during the *voir dire* that

there are occasions when a pediatrician is in fact called upon and required to assess the effects of asphyxia and meconium aspiration syndrome on a newborn, and that as a board-certified pediatrician he had been called upon to do so on numerous occasions. Not coincidentally, Dr. Barden, the plaintiffs' expert obstetrician, who earlier had testified for the plaintiffs, told the court and jury that he preferred to defer to a pediatrician to proffer the opinion whether an earlier cesarean section would have saved the plaintiffs' infant.

■ In this case the trial justice appears to have arbitrarily concluded that a pediatric neurologist could not make a skillful interpretation of obstetrical data and only could speculate on matters related to causation. In doing so, he obviously overlooked Dr. Adler's particular and considerable experience in interpreting obstetrical data, including fetal heart monitoring strips and pH levels. In this case, the question of causation revolved around when meconium aspiration syndrome occurred and, consequently, the approximate time when it became necessary for the defendants to perform a cesarean section. Depending upon his or her training and experience, a board-certified pediatric neurologist might be more qualified than the average pediatrician or perhaps even the average obstetrician to answer questions of causation. A pediatric neurologist by definition deals with injuries to the central nervous system, including the brain, many of which result from oxygen deprivation. As Dr. Adler testified, many of his patients consisted of newborns with injuries resulting from birth asphyxia. That hands-on experience, when coupled with the doctor's qualifications as a board-certified pediatrician and especially as a board-certified pediatric neurologist, we conclude, would qualify him to testify about the cause of the infant's death in this case. We determine that the trial justice clearly abused his discretion and erred in refusing to permit Dr. Adler to proffer his expert opinion about what caused the death of infant Debar. We determine that error to have been so prejudicial to the plaintiffs' case as to constitute reversible error and to require a new trial.

## III

### Other Allegations of Error

Because we have concluded that the trial justice in this case erred, and that such error constituted reversible error necessitating a new trial, we need not address the plaintiffs' remaining appellate issues, except to allude briefly to the plaintiffs' contention regarding the denial of their motion for a trial continuance.

■ When, as in this case, the exclusion of expert testimony by a trial justice leaves a party fatally vulnerable to a defendants' motion for judgment as a matter of law, the endangered party might reasonably be allowed a short continuance to engage another expert witness, or the trial justice should consider whether to treat a defendant's Rule 50 motion as a motion for an involuntary nonsuit pursuant to Rule 50(a)(3).

## IV

### Conclusion

For the foregoing reasons, we sustain the plaintiffs' appeal and vacate the judgment of the Superior Court. The papers of this case are remanded to the Superior Court for a new trial.

Justice FLANDERS did not participate.