**Lucinda MORRA**

v.

**Daniel HARROP.**

**No. 00–149–APPEAL.**

Supreme Court of Rhode Island.

March 6, 2002.

Peter Leach, Providence, for Plaintiff.

Jeffrey G. Latham, East Greenwich, David W. Carroll, Providence, for Defendant.

1. Although multiple plaintiffs are listed in the pleadings, Lucinda Morra was the only party to appear at trial and pursue this claim.

Present: WILLIAMS, C.J., LEDERBERG, BOURCIER, FLANDERS, and GOLDBERG, JJ.

## OPINION

GOLDBERG, Justice.

This case came before the Supreme Court on December 5, 2001, on appeal by the plaintiff, Lucinda Morra (plaintiff),[1] from a judgment of the Superior Court granting the defendant, Dr. Daniel Harrop's (defendant or Dr. Harrop) motion for judgment as a matter of law. The trial justice granted judgment in favor of the defendant after excluding the testimony of the plaintiff's chief expert witness, Dr. John Sharp (Dr. Sharp), and after denying the plaintiff's motion for a continuance to remedy any perceived flaws in Dr. Sharp's testimony. We reverse.

### Facts and Travel

At the time of his death, plaintiff's father, William Morra (Morra), was a patient of Dr. Harrop's, suffering from bipolar disorder. The evidence disclosed that on May 17, 1993, the patient attempted suicide by an overdose of Tylenol. He was treated for the overdose and subsequently admitted to Butler Hospital (Butler) where, because of the suicide attempt and a recent decampment from another facility, he was placed under close supervision without grounds privileges. The evidence disclosed that during the course of this hospitalization, Morra was restless, became increasingly agitated and threatened suicide during discussions about his potential post-discharge placement. The issue of Morra's living arrangements remained a concern, and Dr. Harrop ordered that he remain under close supervision, with the addition of checks every ten minutes by

Thus, Ms. Morra is the sole appellant before this Court.

staff for his continued safety. A discharge meeting with the patient's family and Dr. Harrop was held on May 27, 1993, and, although the question of an acceptable facility was not resolved, Morra's discharge was scheduled for the next day, May 28, 1993. The evidence disclosed that Dr. Harrop then amended his orders, discontinued staff supervision and granted the patient grounds privileges, permitting him to move about the hospital grounds unattended by staff. Doctor Harrop testified that Morra secured grounds privileges at 2:30 p.m. on May 27, 1993, was declared missing at approximately 4 p.m. and that, at approximately 7 p.m., his body was found lying face down in the Seekonk River, near the hospital grounds.

The plaintiff commenced suit against Dr. Harrop, alleging negligent care and treatment of Morra, including the order granting grounds privileges to the patient that, according to the plaintiff, was the proximate cause of his death by suicide. To support her allegation, plaintiff presented the testimony of Dr. Sharp, the associate director for psychiatry inpatient services at Beth Israel Deaconess Medical Center, an expert witness in the field of psychiatry and the treatment of patients hospitalized with suicidal tendencies. Doctor Sharp testified that Morra was admitted to Butler with bipolar disorder, that he was given medications that were inadequate to treat that disorder, that he suffered from suicidal ideation, and had voiced extreme disagreement with the discharge plan. In Dr. Sharp's opinion, on May 27, 1993, at the point that Dr. Harrop authorized grounds privileges, Morra was harboring a suicidal intention and plan. Doctor Sharp concluded that the patient committed suicide by drowning and that, in his opinion, Dr. Harrop's treatment of Morra was negligent and was a deviation from the degree of care and skill that commonly is possessed by other physicians in the field.

Specifically, Dr. Sharp testified that given the patient's mental state, the planned discharge to a less secure setting was inappropriate and, in light of the patient's potential for suicide, Dr. Harrop deviated from the standard of care when he approved grounds privileges. In his opinion, Dr. Harrop's failure to recognize that Morra's request for grounds privileges and his sudden upturn in mood could be an indication of intensified suicidal intention and was a deviation from the standard of care.

The issue of causation relative to the manner of death was contested by the defense, and a dispute arose over whether the death was a suicide. At a hearing outside the presence of the jury, Dr. Sharp excluded as the manner of death homicide, accident, heart failure, seizure, stroke, or any other brain abnormality or disease. He rendered an opinion that the patient committed suicide and testified that he based his opinion as follows:

"The basis of the opinion is in addition to the exclusion of homicide and accidental death is his state of mind, his unstable psychiatric condition, his suicidal ideations throughout his hospitalization; his heightened suicidal ideation, intention and plan upon asking for ground privileges; his firm, unequivocal statement that he would rather be dead than go to live in assisted living and the time course of the meeting where that reality was presented to him as his disposition plan."

After this hearing, defendant was allowed a continuing objection to any testimony relating to the manner of death. Before the jury, Dr. Sharp reiterated his opinion that the manner of death was suicide; and he again eliminated homicide, accident, and physical causes. When asked his opinion relative to the patient's manner of death he responded, "Mr. Mor-

ra's manner of death was suicide." Defense counsel immediately reminded the trial justice that he had a continuing objection to this testimony. The trial justice, however, did not rule upon this objection, and the following testimony was admitted into evidence over defendant's objection:

"It's my opinion that Mr. Morra died by suicide through drowning; that he had been suicidal throughout his hospitalization and at the point of his requesting grounds privileges. He had a history of serious suicide attempts, including by drowning in the past. That the fact that his body was found in the condition that it was, clothed, face down in the water, the autopsy report supporting death by drowning and not supporting death by homicide or accidental causes, leads me to the conclusion that the *only possibility was suicide by drowning.*" (Emphasis added.)

Because of the trial justice's failure to rule on defendant's continuing objection, this evidence became part of plaintiff's case in chief and, the absence of a ruling deprived plaintiff of any opportunity to rephrase the question or to seek a clarification. Notwithstanding, two days later, without any notice to plaintiff, this answer served as the sole basis for striking all of Dr. Sharp's testimony relative to the manner of death. After plaintiff concluded her case in chief, defendant moved to strike all of Dr. Sharp's testimony on the ground that Dr. Sharp "talk[ed] in terms of possibility" and that his testimony lacked a degree of certitude or certainty that "a given state of affairs is a result of a certain cause." Clearly taken by surprise, counsel for the plaintiff argued valiantly that Dr. Sharp's opinion was that suicide was not a mere possibility but was "the *only* possibil-

ity," and further, that Dr. Sharp had excluded all other potential classifications of death. (Emphasis added.) This argument was rejected by the trial justice, who stated, "I don't think I have an alternative but to strike it." The plaintiff's request for a continuance for the "limited purpose of curing that particular language of probability and possibility" was also denied. The trial justice granted the motion to strike Dr. Sharp's testimony and held,

"Possibility is not enough in medical negligence cases. There is no room for doubt; there is a term or a concept that's absolutely necessary, and that's probability. There is a term or a concept that is absolutely insufficient, and that's possibility."

The defendant's motion for judgment as a matter of law was immediately granted, thus terminating this case. The plaintiff has appealed.

## Discussion

▉ The first issue before us is whether the trial justice erred in striking Sharp's testimony based on his opinion that suicide was "the only possibility" in this case.[2] This question turns on whether Sharp's opinion was expressed with sufficient credibility or validity to assist the fact-finder. The determination of the admissibility of an expert witness's testimony rests within the sound discretion of the trial justice and will not be disturbed on appeal absent an abuse of that discretion. *State v. Capalbo*, 433 A.2d 242, 246–47 (R.I.1981); *State v. Benton*, 413 A.2d 104, 113 (R.I.1980). This is not to suggest however that a discretionary ruling is not reviewable. "What it does mean is that the ruling will be sustained provided the discretion has been soundly and judicially

---

**2.** Although the trial justice found that Dr. Sharp used the term "possibility" a number of times during his testimony, defendant has

conceded and the record disclosed that he used the term on only this single occasion.

exercised, that is, if it has been exercised in the light of reason applied to all the facts and with a view to the rights of all the parties to the action, * * * and not arbitrarily or willfully, but with just regard to what is right and equitable under the circumstances and the law." *DeBartolo v. DiBattista,* 117 R.I. 349, 353, 367 A.2d 701, 703 (1976). The purpose of expert testimony is to aid in the search for the truth. It need not be conclusive and has no special status in the evidentiary framework of a trial. This Court consistently has held that a jury is free to accept or to reject expert testimony in whole or in part or to accord it what probative value the jury deems appropriate. "Moreover, in the course of expert testimony it is common for the witness, implicitly or explicitly, to exclude conclusions other than the one reached by [the witness]." *Benton,* 413 A.2d at 112. We have never required an expert to "use * * * the talismanic phrase 'strong probability.'" *State v. Lima,* 546 A.2d 770, 773 (R.I.1988). This Court clearly has enunciated that the admissibility of expert testimony does not require the use of "magic words" or "precisely constructed talismanic incantations" to achieve its objective. *Gallucci v. Humbyrd,* 709 A.2d 1059, 1066 (R.I.1998). "The expert must merely testify to the effect that he reached his conclusion with reasonable medical certainty." *Lima,* 546 A.2d at 773. This standard is equally applicable in negligence cases, including cases in which the alleged tort-feasor is a member of the medical profession. We have never held that there is a term or concept that is "absolutely necessary" in medical malpractice cases nor have we repudiated the use of any term as "absolutely insufficient." If an expert's testimony is given with the requisite degree of certainty, that is, "some degree of positiveness," it matters not what words are used to convey that certainty or that the word "possibility" was

uttered. *Sweet v. Hemingway Transport, Inc.,* 114 R.I. 348, 355, 333 A.2d 411, 415 (1975). Absolute certainty, of course, never has been required. "In those cases where expert testimony is relied on to show that out of several potential causes a given result came from one specific cause the expert must report that the result in question 'most probably' came from the cause alleged." *Id.* The expert's opinion, therefore, must have "substantial probative value" and not be speculation, mere conjecture or surmise. *Montuori v. Narragansett Electric Co.,* 418 A.2d 5, 10 (R.I. 1980). If the expert has testified with "some degree of positiveness," his or her testimony is admissible and issues relative to the weight of the evidence are left to the fact-finder. *Sweet,* 114 R.I. at 355, 333 A.2d at 415.

In the case before us, we are of the opinion that Dr. Sharp's testimony was more than adequate and that the trial justice erred in granting defendant's motion to strike, both on substantive and procedural grounds. In clear and unequivocal language, Dr. Sharp not only classified Morra's death as a suicide, he eliminated homicide, accident and disease. Thus, of the other generally accepted "means or fatal injury that caused a death," Dr. Sharp concluded that suicide was the *only* possibility. See G.L.1956 §§ 23–4–1(e) and 23–4–4 (Manner of death is defined as the "fatal agency that caused a death;" the state medical examiner is authorized to conduct an examination in those instances in which the manner of death could be classified as homicide, suicide, or casualty). We can hardly envision an expert opinion that is more precise and definite. Dr. Sharp's opinion thus exceeded the term probability and entered the sphere of certainty. There is no stronger way of saying that an event most probably occurred then saying that the event in fact occurred.

 Although striking the expert's testimony in its entirety was an abuse of discretion, this error was further compounded by the trial justice's denial of a brief continuance to permit plaintiff to recall Dr. Sharp in an attempt to clarify his testimony and avoid the inevitable Rule 50 judgment. The plaintiff was left with no witness who could proffer an opinion relative to the standard of care and whether Dr. Harrop's treatment of Morra deviated from that standard of care. As this Court made clear in *Debar v. Women and Infants Hospital*, 762 A.2d 1182, 1189 (R.I. 2000), "[w]hen, as in this case, the exclusion of expert testimony by a trial justice leaves a party fatally vulnerable to a defendant['s] motion for judgment as a matter of law, the endangered party might reasonably be allowed a short continuance" to clarify the issue or engage another witness. Further, "the trial justice should consider whether to treat a defendant's [Super. R. Civ. P.] 50 motion as a motion for an involuntary nonsuit pursuant to Rule 50(a)(3)." *Debar*, 762 A.2d at 1189. The plaintiff in this case was in the fifth day of trial and had invested significant time and expense in the preparation and the presentation of her case. Having found Dr. Sharp's testimony to be so flawed as to warrant its exclusion, plaintiff should have been afforded a short continuance to attempt to remedy any perceived flaws in his expert's testimony. Accordingly, when faced with the unexpected and premature termination of litigation, it is incumbent upon the trial justice to grant a reasonable continuance or consider an involuntary dismissal, or non-suit, and to set forth his or her reasons for denying the same. Significantly, during a mid-trial *voir dire*, Dr. Sharp had given unequivocal testimony about suicide as the manner of death without invoking the term "possibility." Although the trial justice found this evidence to be insufficient to survive defense counsel's motion to strike, this testimony should have served as the basis for a reasonable continuance to clarify this vital point. Instead, the trial justice ruled that Dr. Sharp "had not been short-changed in voicing his opinion or the facts that lead him to his opinions," that she did not view his use of the term possibility "as language to be cured" and that plaintiff's counsel had "pushed the intellectual envelope as far as he could intellectually go." The request for a continuance was thereupon denied. We deem this to be reversible error.

 Finally, we take this opportunity to address the proper role of a "continuing objection" at trial. As a general matter, we have long held to the "contemporaneous objection" rule, requiring a party to make known to the court, at the time a ruling is sought, the basis for the request. This Court will not review objections to the admission of evidence that were not preserved by a specific objection " 'sufficiently focused so as to call the trial justice's attention to the basis for said objection.' " *State v. Toole*, 640 A.2d 965, 972 (R.I.1994). "[I]ssues that present themselves at trial and that are not preserved by a specific objection * * * 'sufficiently focused so as to call the trial justice's attention to the basis for said objection, may not be considered on appeal.' " *Tinney v. Tinney*, 770 A.2d 420, 433 (R.I.2001) (quoting *State v. Anderson*, 752 A.2d 946, 948 (R.I.2000)). However, Rule 46 of the Superior Court Rules of Civil Procedure recognizes that once a potential error has been brought to the attention of the trial justice and overruled, a continuing objection may be granted by the court, thereby making it unnecessary "for the party to repeat the objection thereafter, but every part of such testimony thereafter introduced shall be deemed to have

been duly objected to and the objection overruled." The "continuing objection," therefore, facilitates more orderly and efficient proceedings at trial by serving the purposes of the "contemporaneous objection" rule, while making it unnecessary for the objecting party to interrupt the trial at every turn to preserve an issue for appellate review. The purpose of the "continuing objection" is not, however, to leave an issue open for a determination of admissibility at a later point during the trial. The evidence had been admitted over objection; counsel may not later seek to waylay an unsuspecting party with a motion to strike an entire line of testimony. The plaintiff had every right to rely on the fact that the trial justice had allowed Dr. Sharp's opinion into evidence. Counsel could reasonably expect to conclude the case comfortable with the knowledge that he had presented sufficient evidence on this vital element of the claim. If the testimony was erroneously admitted then the trial justice has committed an error of law. It is for this Court, on appeal, to pass upon that error of law. The function of the "continuing objection" is not to effectively buy time otherwise unavailable to trial counsel for later deliberations on the admissibility of evidence. As noted, Dr. Sharp's testimony was stricken on the fifth day of trial and after plaintiff had presented three more witnesses. To strike the testimony of a key witness at such a late phase in the trial, and after his testimony had been unconditionally admitted is a misuse of the "continuing objection" and an abuse of the trial justice's discretion.

## Conclusion

For the reasons stated herein, the plaintiff's appeal is sustained, the judgment of the Superior Court is vacated, and the papers in the case are remanded to the Superior Court for a new trial consistent with this opinion.