**Supreme Court**

No. 2013-297-Appeal.
No. 2013-298-Appeal.
No. 2013-299-Appeal.
(PC 07-4069)

Antonio Ribeiro                          :

v.                                       :

The Rhode Island Eye Institute, et al.   :

NOTICE: This opinion is subject to formal revision before publication in the Rhode Island Reporter. Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Tel. 222-3258 of any typographical or other formal errors in order that corrections may be made before the opinion is published.

Antonio Ribeiro              :

v.                           :

The Rhode Island Eye Institute, et al.      :

Present:  Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

**O P I N I O N**

**Justice Flaherty, for the Court.**  These appeals arise from a medical malpractice lawsuit brought by the plaintiff, Antonio Ribeiro, against his optometrist, Dr. Martin Newman, and Dr. Newman's employer, the Rhode Island Eye Institute, LLC.  At trial, Ribeiro argued that Dr. Newman had breached the duty of care to him because he failed to diagnose a detached retina, and that that negligence had resulted in a permanent vision loss in Ribeiro's right eye.  Ribeiro also sought to hold the Eye Institute liable vicariously for Dr. Newman's negligence.  At the close of Ribeiro's case, the defendants moved for judgment as a matter of law, pursuant to Rule 50 of the Superior Court Rules of Civil Procedure, arguing that Ribeiro had failed to meet his burden of proving that there had been a deviation from the standard of care, proximate causation, and damages.  The trial justice took the motions under advisement and the defendants proceeded with their case.

After hearing all the evidence, the jury returned a verdict in favor of defendants, finding that, although Dr. Newman had violated the standard of care in treating Ribeiro, that violation

- 1 -

was not the cause of Ribeiro's vision loss. All parties then filed posttrial motions. Ribeiro moved for a new trial, arguing that the trial justice erred by restricting the trial testimony of his causation expert. The defendants renewed their motions for judgment as a matter of law and, in the alternative, moved for a new trial on the issue of standard of care. The trial justice denied all posttrial motions. The parties, having timely appealed and cross-appealed, are now before this Court, arguing that the trial justice erred in denying their respective motions. We conclude that the trial justice impermissibly limited the testimony of Ribeiro's causation expert. Consequently, we vacate the judgment and remand for a new trial on all issues.

# 1

## Facts and Travel

### A. The Appointments

### The August 24, 2004 Appointment

On August 24, 2004, Antonio Ribeiro, a forty-year-old tradesman, came to see Dr. Newman at the Eye Institute because he had been experiencing blurred vision in his right eye for the previous three to four weeks. Doctor Newman testified that he examined Ribeiro's eye, and, during the course of that exam, he employed five separate diagnostic tests to determine the cause of Ribeiro's blurred vision.

First, Dr. Newman said, he set out to determine Ribeiro's visual acuity and to determine to what extent Ribeiro could see out of his right eye. Doctor Newman found that Ribeiro's corrected vision in his right eye was 20/60, whereas previously it had been 20/20.[1] Second, Dr. Newman performed an Amsler Grid Test, which revealed that, although Ribeiro had normal peripheral vision in his right eye, his direct vision—the point at which the eye focuses—was

---

[1] This meant that Ribeiro could read with his right eye, at a distance of twenty feet, what a person with normal vision could see at sixty feet.

blurry.[2]  Third, Dr. Newman said that he conducted a Confrontation Visual Field Test; this test also indicated that Ribeiro had normal peripheral vision.  Doctor Newman then performed a physical examination on Ribeiro's right eye.  Using a slit lamp, Dr. Newman determined that the front of the eye appeared normal.  Finally, Dr. Newman used an ophthalmoscope to examine the back of Ribeiro's eye—including the retina, the macula, and the fovea—by performing what is known as a fundoscopy.[3]  Doctor Newman testified that at that point, he noticed that something was amiss: a "circumscribed elevation" in the macula of Ribeiro's right eye that appeared to be filled with fluid.

Based upon Ribeiro's age and complaints, Dr. Newman determined that Ribeiro was suffering from central serous retinopathy, commonly referred to as CSR.  Doctor Newman explained that CSR occurs when fluid accumulates behind the retina, and that it will normally appear as a "blister" on the back of the eye.  He said that central serous retinopathy is not normally a serious condition and that it often resolves on its own when the fluid is reabsorbed into the eye.  Doctor Newman testified that he instructed Ribeiro to return for a follow-up appointment in six to eight weeks because that is normally how long it takes for CSR to resolve.  However, he also cautioned Ribeiro that if his condition worsened, or if it did not improve in the course of the six to eight weeks, that Ribeiro should contact him.

Finally, Dr. Newman referred the patient for an Optical Coherence Tomography scan, or OCT.  Doctor Newman testified that he ordered the scan to confirm his diagnosis and to garner

---

[2] According to Dr. Newman, an Amsler Grid Test requires the patient to focus on a point in the grid and describe any distortions in the grid pattern surrounding that point.

[3] In medical parlance, "fundus" refers to the back or base.  The back of the eye is known as the retina, and the macula is the center of the retina.  The eye's cornea and lens project images onto the retina.  The macula's center, the fovea, is responsible for direct vision.  When the macula is damaged, the eye loses its ability to focus, resulting in blurred vision and reduced visual acuity.

additional information about Ribeiro's eye. At the time of Ribeiro's visit, OCT was a relatively new technology that Dr. Newman had been using for several months. A fundoscopy provides a two-dimensional view of the back of the eye, but OCT gives optometrists a better view of the back of the eye by taking a series of photographs that result in a more detailed, three-dimensional scan. Doctor Newman testified that he interpreted the six images from the OCT scan the following day, August 25, 2004. He said that, based on the images from the test, he was able to confirm that Ribeiro was, in fact, suffering from CSR. Doctor Newman said that he did not report the results of the OCT to Ribeiro because they merely reinforced his earlier diagnosis of CSR.

### The October 25, 2004 Appointment

Ribeiro traveled to Portugal for a family vacation from mid-September into early October. While he was away, his vision worsened. Ribeiro testified that towards the end of the trip, he was experiencing increasingly blurred vision. Ribeiro returned to see Dr. Newman on October 25, 2004. This time, when Dr. Newman examined Ribeiro, he noticed that the vision in Ribeiro's right eye had significantly worsened from 20/60 in August to 20/400 in October. Doctor Newman conducted another fundoscopy and slit lamp exam, and he ordered another set of OCT scans. Doctor Newman also dilated Ribeiro's eye and examined it. Doctor Newman testified that, despite the patient's deteriorating vision, his eye appeared "very similar" in October as it had appeared to be in August. He said that he did not "find anything additional going on in the retina that [he] had seen back in August." Doctor Newman again diagnosed Ribeiro with CSR. However, because Ribeiro's symptoms had not resolved on their own, Dr. Newman also referred Ribeiro to a retinal specialist, Dr. Timothy You, an ophthalmologist at the Eye Institute.

**The November 1, 2004 Appointment**

Ribeiro met with Dr. You on November 1, 2004. After examining Ribeiro, Dr. You diagnosed Ribeiro not with CSR, but with a retinal detachment.[4] The record reveals that although CSR and retinal detachments each involve fluid buildup in the back of the eye, a retinal detachment, unlike CSR, is a serious condition that has the potential to cause permanent vision loss. When the retina is detached, a tear develops in the back of the eye. That tear fills with fluid, eventually causing the retina to pull away from the eye. Over time, the retina loses its blood supply and ceases to function. Because of the significant risk of vision loss from a retinal detachment, Dr. You recommended surgery. Ribeiro agreed, and three days later he underwent surgery in hopes of repairing the tear and restoring blood flow to his eye. Despite Dr. You's efforts, however, surgery was unable to improve Ribeiro's vision. The result has been that since November 2004, Ribeiro's corrected vision is 20/400, he has lost his central vision, and his vision remains blurry.

**B. The Evidentiary Rulings**

Before and during trial, defendants made several motions that sought to limit the scope of the issues to be determined by the jury and to limit which witnesses would be allowed to testify about those issues. The plaintiff disclosed that he would be calling two expert witnesses. First, he would produce an optometrist, David Greenstein, O.D., who would testify that Dr. Newman deviated from the standard of care when he failed to rule out a detached retina on August 24, 2004. Second, he would call Susan Bressler, M.D., an ophthalmologist, who would testify to the causes and consequences of the fluid buildup in Ribeiro's right eye in August 2004. Because

---

[4] A retinal detachment occurs when a hole, break, or tear causes the retina to pull away from the surrounding tissue of the eye. Stedman's Medical Dictionary 523 (28th ed. 2006).

Ribeiro alleged that Dr. Newman was negligent only on August 24, 2004, much of the discussion between the parties and the trial justice focused on the extent, if any, to which Dr. Bressler would be allowed to testify about the results of the October 2004 OCT scans and the conclusions she drew from Dr. You's notes.

### The November 1, 2011 Motion

At first, defendants sought to preclude Dr. Bressler from testifying about her interpretation of either of the OCT scans. At a hearing on their motion in limine, defendants conveyed their concern that the jury might well conclude that Dr. Bressler, an ophthalmologist, was opining that Dr. Newman violated the standard of care of an optometrist.[5] Ribeiro countered that Dr. Bressler would testify about the OCT results only to the extent that they helped her form her opinion that the scans showed that Ribeiro's condition worsened in the interim between the two tests and that it could no longer be repaired. As he considered the parties' arguments, the trial justice asked for and received an offer of proof from plaintiff as to what Dr. Bressler would say about her interpretations of the OCT scans. The plaintiff said that:

> "Dr. Bressler will testify about causation, the rest of the case, the causation and damage[s] piece. She is an ophthalmologist. She will testify that she reviewed the OCT results. Based on the information in the OCT results, Mr. Ribeiro had a detached retina where part of the macula was detached, which is the center of the eye, in August, on August 24th, 2004. At that time, the macula could have been reattached and Mr. Ribeiro's vision could have been saved or made better even. Dr. Bressler will testify that on October 25th, 2004, as compared to the

---

[5] Because much of defendants' concerns focused on the risk that the jury would use the testimony of Dr. Bressler, an ophthalmologist, to evaluate whether or not Dr. Newman, an optometrist, breached the standard of care, we feel the need to elucidate the difference between the two. Ophthalmologists and optometrists differ in their levels of training and in what they can diagnose and treat. An ophthalmologist can diagnose and treat all forms of eye disease and can perform eye surgery. Stedman's Medical Dictionary at 1374. On the other hand, an optometrist's primary role is to provide vision care by testing and correcting vision using corrective lenses as well as detecting certain eye abnormalities. See id. at 1376.

August 24th, 2004 OCT, the information contained in the October OCT results show that at that point the macula is completely off, is off, and it cannot be – vision at that point, even with surgery, cannot be restored. You have to reattach the macula but it will not restore vision because there's been too much passage of time and that has allowed the macula to become completely detached. That's her testimony."

After hearing that explanation, the trial justice determined that it was unnecessary to rule on defendants' motion at that time. Rather, he thought it best to allow the parties to limit the scope of Dr. Bressler's testimony through the usual means: by plaintiff examining the witness and defendants objecting to any questions that they thought would elicit standard-of-care testimony from the causation witness.

### The November 10, 2011 Motion

Despite the seemingly straightforward disposition of the November 1 pretrial motion, the trial justice took up additional motions from defendants about the scope of Dr. Bressler's testimony after trial began. Again raising concerns about jury confusion, defendants sought to confine Dr. Bressler's testimony about the August and October OCTs to hypothetical questions so that the jury would not confuse her opinion as to causation with a determination of whether Dr. Newman breached the standard of care when he examined plaintiff. The plaintiff countered that the issue had already been decided on November 1, and that the court had concluded that it was unnecessary to rule on defendants' motion. The plaintiff again stressed that Dr. Bressler's interpretations of the August and October OCT results was necessary to meet his burden on causation. Specifically, plaintiff argued that the jury needed to hear Dr. Bressler's interpretations of both results in order to weigh her credibility and evaluate the basis for her opinion that Ribeiro's eyesight could have been repaired in August, but not in October.

The defendants then asked that the trial justice instruct the jury, in advance of Dr. Bressler's testimony, that her opinion could not be used to evaluate whether or not Dr. Newman deviated from the standard of care. The plaintiff responded that the issue had already been decided during the November 1 hearing and, further, that defendants' concerns about juror confusion if Dr. Bressler was allowed to testify about her interpretations of the October OCT were misplaced, because the jury would not be asked to determine if Dr. Newman breached the standard of care in October. Eventually, the trial justice found that because there was

> "the potential risk of confusion as it relates to Dr. Bressler's testimony about the October OCT scan. * * * The [c]ourt will permit the plaintiff to conduct – question Dr. Bressler without hypotheticals concerning the August OCT. However, the [c]ourt will order that the questioning of Dr. Bressler concerning the October OCT be presented to her by use of a hypothetical question."

The plaintiff articulated that this limitation would prejudice his case because it would prevent Dr. Bressler from testifying about how the condition in Ribeiro's eye progressed from the August 2004 office visit through the November 2004 corrective surgery.

The defendants raised two more concerns. First, they urged that plaintiff was attempting to use Dr. Bressler's causation testimony to "fix" the testimony of his standard of care expert, Dr. Greenstein. Specifically, they argued that plaintiff was trying to correct Dr. Greenstein's testimony in which he said that, to a reasonable degree of medical probability, the August OCT showed a detached retina, but the October OCT showed CSR. The parties agreed that this was a medical impossibility. Second, they objected on relevance grounds to Dr. Bressler testifying about the October OCT. They argued that any opinion Dr. Bressler had about the condition of Ribeiro's eye in October was irrelevant to her causation opinion because there was no allegation

- 8 -

that Dr. Newman was negligent in October. Thus, defendants argued, Dr. Bressler's testimony should be limited strictly to her interpretation of the August OCT.

After asking plaintiff whether it was necessary for him to ask Dr. Bressler about her interpretation of the October OCT and receiving an affirmative response, the trial justice amended his earlier ruling:

> "The [c]ourt will modify or change its earlier ruling. The [c]ourt will first, before Dr. Bressler testifies, inform the jury of the limited purpose for which she is being offered, that being causation. The [c]ourt will certainly invite counsel to suggest a proper instruction that they feel would be appropriate on that statement. The [c]ourt will permit the plaintiffs to question Dr. Bressler concerning both the August and October OCT results."

Undeterred, defendants then challenged the extent to which the court would allow Dr. Bressler to testify about the "chronicity" or duration of Ribeiro's detached retina, contending that plaintiff had failed to disclose Dr. Bressler's opinion about the chronicity of Ribeiro's retinal detachment, either in Dr. Bressler's deposition or in their expert disclosure. Specifically, the parties and the court discussed whether chronicity was described in Dr. You's medical records. Complicating matters even further was the fact that when plaintiff posed hypothetical questions about Dr. You's medical records to Dr. Greenstein during his testimony, the trial justice had instructed the jury that as a matter of law, Dr. You did not conclude that Ribeiro suffered from a chronic retinal detachment.[6] Although plaintiff conceded that the word "chronicity" did not appear either in Dr. You's notes or in his deposition, counsel argued that the description of Ribeiro's eye injury and its prolonged nature was detailed at length in those materials and that Dr. Bressler explicitly

---

[6] At defendants' request, the trial justice provided the following cautionary instruction: "I am instructing you as a matter of law, and this is something that you will not be able to disagree with, that there is no fact in this matter that Dr. You diagnosed Mr. Ribeiro as having a chronic detached retina. You cannot — you will not be able to make that conclusion. That is a nonexistent issue or fact for the jury."

stated during her deposition that she relied not only on the OCT images, but also Dr. You's subsequent examination to form her own opinion that Ribeiro suffered from a chronic detached retina. The defendants responded by reiterating their argument that, regardless of what Dr. You's conclusion was, Dr. Bressler's opinion regarding the October OCT scan was irrelevant because it was not needed to dispute defendants' position that Ribeiro presented with CSR, and not a detached retina, in August.

Finally, the trial justice terminated the merry-go-round of argument and attempted to resolve the dispute surrounding Dr. Bressler's testimony about the duration of Ribeiro's injury. The trial justice said that:

> "I respect the parties' right to ask the [c]ourt by way of a motion in limine to restrict the witness from being asked a question and answer it in a certain way. It is not abundantly clear to this [c]ourt at this moment, and I doubt that it will become clearer in the remaining time today, exactly what question the plaintiff will put to Dr. Bressler concerning the condition of Mr. Ribeiro's eye based upon her examination of the evidence and the deposition. * * * [D]epending on the cross-examination of Dr. Bressler, then * * * the [c]ourt may permit the plaintiffs [sic] on redirect examination to further opine as to the chronicity of Mr. Ribeiro's eye in her opinion. I hope that's clear."

With that, the hearing ended.

### C. Dr. Bressler's Testimony

When Dr. Bressler finally got to the witness stand, she testified that, in her opinion, Ribeiro was suffering from a detached retina at the time of his initial appointment with Dr. Newman in August. Based on her review of the August OCT, the medical records from the Eye Institute, and Dr. You's medical records from the November surgery, Dr. Bressler opined that it was more likely than not that Ribeiro's vision would have been restored to 20/20 corrected—that is, with the aid of eyeglasses or contact lenses—if Dr. Newman had immediately referred him to

a retinal specialist. This was important, she said, "[b]ecause every moment one is delaying in an opportunity for that detachment to extend in a superior direction through the remaining central vision and even go beyond that to lift off more of the superior retina, all of which would lead to a much poorer prognosis."

The plaintiff then asked Dr. Bressler to consider the October 25 OCT scans. The defendants immediately objected. At sidebar, during another complicated and confusing argument, the parties and the trial justice attempted to reconstruct exactly what the trial justice's previous ruling had been with respect to Dr. Bressler's proposed testimony concerning the October OCT. The defendants insisted that the trial justice's final ruling was that "unless the defendants got into the October OCT, the witness was not going to be permitted to testify to that October OCT and that the plaintiff, if the defense opened the door, would be permitted to explore the OCT in redirect examination." The plaintiff disagreed, arguing that the court had ruled that plaintiff would be permitted to ask Dr. Bressler about both the August and October OCTs. This, plaintiff argued, was necessary to reveal the condition of Ribeiro's eye on both dates, as well as to provide a foundation for Dr. Bressler's opinion testimony. Adopting defendants' view of his earlier ruling, the trial justice sustained their objection. However, the trial justice added the caveat that "if the defendants, even in the slightest degree on cross-examination directly or inferentially, get into the duration of Mr. Ribeiro's retinal detachment, the [c]ourt will consider allowing the plaintiff to redirect this witness based upon her examination of the October OCT."

Following the sidebar, plaintiff asked Dr. Bressler if she had reviewed the evidence in the medical records from Ribeiro's appointment with Dr. You on November 1, 2004. The defendants immediately objected again on the grounds that if plaintiff was precluded from asking Dr. Bressler about the October OCT, then she could not be asked about Dr. You's records either.

When asked by the trial justice why he should be allowed to ask Dr. Bressler about Dr. You's medical notes, plaintiff responded that "[t]his goes exactly to her opinion, * * * that by the time [Ribeiro] went back in October, nothing could have been done for him * * *. [The plaintiff needs] to provide her some [basis] for her to testify about what was the status by the time [Ribeiro] went back in November." The trial justice ruled that plaintiff was precluded from inquiring of Dr. Bressler about Dr. You's records unless defendants first broached the subject on cross-examination.

Barred from asking Dr. Bressler about the worsening condition of Ribeiro's eye from August through November, plaintiff moved on to the current state of his vision. Doctor Bressler did testify that Ribeiro lost all his central vision and that his vision was 20/200 to 20/400 with the best possible correction in his right eye. She also testified that Ribeiro's loss was permanent, due to a loss of blood flow to the optic nerve in his right eye, causing it to atrophy.

During cross-examination, neither counsel for Dr. Newman nor counsel for the Eye Institute asked Dr. Bressler about the October OCT or Dr. You's treatment of Ribeiro. As a result, Dr. Bressler concluded her testimony without offering an opinion about what the October OCT or Dr. You's notes revealed about the cause of Ribeiro's injury or any available treatment for it. The following day, plaintiff rested and defendants made their Rule 50 motions. The trial justice reserved ruling on their motions. The defendants proceeded with their case, calling only Dr. Newman as a witness. On direct examination, defendants, over plaintiff's objections, questioned Dr. Newman about Ribeiro's eye condition during the period from August through October 2004. Doctor Newman testified that, based on his treatment records and his interpretation of the October OCT, Ribeiro suffered from CSR on October 25, 2004, and not from a detached retina. At the conclusion of trial, the jury returned a verdict that Dr. Newman

had indeed deviated from the standard of care, but that his deviation was not the proximate cause of Ribeiro's injury.

## D. Posttrial Motions and Decision

After the verdict, all parties filed posttrial motions. The plaintiff moved for a new trial, arguing that the trial justice erred when he restricted Dr. Bressler's testimony about the October OCT because that testimony was necessary to demonstrate that plaintiff's eye condition was no longer correctable after Dr. Newman failed to diagnose a retinal detachment in August. The defendants renewed their motions for judgment as a matter of law and, in the alternative, they filed a motion for a new trial on the issue of standard of care. The trial justice denied all posttrial motions. In denying plaintiff's motion for a new trial, the trial justice found that,

> "[b]ecause the alleged negligence was limited to August 24, 2004, evidence of causation was appropriately similarly limited to that date. * * * The risk that the jury would conclude that Dr. Bressler, an ophthalmologist, was opining that Dr. Newman had breached the standard of care for an optometrist outweighed the probative value of her testimony about the diagnosis of Mr. Ribeiro's condition after the time frame in which she had testified surgery was necessary to avoid the eventual outcome."

Moreover, the trial justice found that, to the extent that there was any error in excluding this portion of Dr. Bressler's testimony, such error was harmless because it was limited "only to the extent that she intended to talk about Mr. Ribeiro's condition in October, two months after anything could have been done to prevent his permanent vision loss." Likewise, the trial justice denied defendants' motion for judgment as a matter of law and motion for a new trial.

## 2

## Issues on Appeal

The parties argue that the trial justice erred in denying their respective motions. Because we agree with plaintiff that the trial justice erred by restricting his causation expert's trial

testimony under Rule 403 of the Rhode Island Rules of Evidence, and because it is dispositive of this appeal, we will address only that issue.

**3**

**Standard of Review**

We review a trial justice's decision to allow or disallow expert opinion testimony for an abuse of discretion. Franco v. Latina, 916 A.2d 1251, 1258 (R.I. 2007); see Votolato v. Merandi, 747 A.2d 455, 460 (R.I. 2000) ("[this] abuse-of-discretion standard includes review to determine that the discretion was not guided by erroneous legal conclusions." (quoting Koon v. United States, 518 U.S. 81, 100 (1996)); Gallucci v. Humbyrd, 709 A.2d 1059, 1064 (R.I. 1998) ("This Court will not disturb a trial justice's ruling on the admissibility of evidence absent an abuse of discretion.").

In medical malpractice cases, an expert witness must opine "that the opinions offered rise to the level of reasonable medical certainty, that is, some degree of positiveness or probability and not possibility." Riley v. Stone, 900 A.2d 1087, 1092 (R.I. 2006) (citing Morra v. Harrop, 791 A.2d 472, 477 (R.I. 2002)). "If the expert has testified with the requisite degree of positiveness, 'his or her testimony is admissible and issues relative to the weight of the evidence are left to the fact-finder.'" Id. (quoting Morra, 791 A.2d at 477). However, expert testimony "has no special status in the evidentiary framework of a trial" and is still subject to the strictures of Rule 403. Morra, 791 A.2d at 477. Indeed, the trial justice serves an important "gatekeeping function" when it comes to admitting expert testimony. See Owens v. Silvia, 838 A.2d 881, 891 (R.I. 2003). That is so, because "[e]xpert evidence can be both powerful and quite misleading because of the difficulty in evaluating it. Because of this risk, the judge in weighing possible prejudice against probative force under Rule 403 * * * exercises more control over experts than

- 14 -

over lay witnesses." Dawkins v. Siwicki, 22 A.3d 1142, 1154 (R.I. 2011) (quoting DiPetrillo v. Dow Chemical Co., 729 A.2d 677, 688 (R.I. 1999)).

## 4

## Analysis

The trial justice excluded Dr. Bressler's opinion testimony with respect to the October OCT scan on the basis that (1) her testimony concerning that OCT scan was irrelevant and that (2) her testimony risked confusing the jury about the difference between standard of care and causation expert testimony. We address these rulings in turn.

Rule 401 of the Rhode Island Rules of Evidence provides that relevant evidence is evidence that has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." And Rule 402 of the Rhode Island Rules of Evidence provides that "'[a]ll relevant evidence is admissible' except as otherwise provided by law." Boscia v. Sharples, 860 A.2d 674, 678 (R.I. 2004). In a medical malpractice action, the burden is on the plaintiff to establish "that the defendant had a duty to act or refrain from acting and that there was a causal connection between his or her breach of that duty and the plaintiff's injury." Perry v. Alessi, 890 A.2d 463, 467 (R.I. 2006) (citing Schneck v. Roger Williams General Hospital, 119 R.I. 510, 514, 382 A.2d 514, 516-17 (1977)). This causal connection, or proximate cause, must be part of the "natural, unbroken and continuous sequence" that produced the plaintiff's injury. DiPetrillo, 729 A.2d at 692. "[I]f a fair preponderance of the evidence discloses facts and circumstances proving a reasonable probability that the defendant's negligence was the proximate cause of the injury, the plaintiff has satisfied his burden of proof." Schneck, 119 R.I. at 517, 382 A.2d at 518. Nonetheless, even if evidence is relevant, Rule 403 provides a trial justice with discretion to

exclude it "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

In balancing the possible prejudicial effect of an expert's testimony against its probative value, a trial justice should keep in mind that "[h]elpfulness to the trier of fact is the most critical consideration for the trial justice in determining whether to admit proposed expert testimony." Owens, 838 A.2d at 891 (citing State v. Wheeler, 496 A.2d 1382, 1388 (R.I. 1985)). Moreover, "[u]nless evidence is of limited or marginal relevance and enormously prejudicial, the trial justice should not act to exclude it." Wells v. Uvex Winter Optical, Inc., 635 A.2d 1188, 1193 (R.I. 1994). Our review of the record leads us to conclude that there was no basis on which to characterize Dr. Bressler's testimony as irrelevant or enormously prejudicial.

In his posttrial decision denying plaintiff's motion for a new trial, the trial justice determined that, because plaintiff's theory of the case was that Dr. Newman violated the standard of care on August 24, 2004, the only relevant causation testimony from Dr. Bressler was what would have happened to Ribeiro's eye had Dr. Newman complied with the standard of care on that date. For that reason, the trial justice allowed Dr. Bressler to testify that, in her professional opinion, had Dr. Newman complied with the standard of care when he arrived at his differential diagnosis on August 24, 2004, and had Dr. Newman referred Ribeiro to a retinal specialist on that date, the retinal specialist could have with "reasonable probability" restored vision to Ribeiro's eye.

However, it is our opinion that plaintiff not only needed to prove that Dr. Newman deviated from the standard of care in August 2004, but also that his failure to do so set in motion the "natural, unbroken and continuous sequence" that eventually resulted in the patient's grossly

diminished vision.  DiPetrillo, 729 A.2d at 692.  That is, plaintiff needed to show not only a deviation from the standard of care, but he also needed to prove what actually did happen as a result of that deviation.  The key to proving causation is establishing the link between a deviation from the standard of care and the harm that results.  It is our opinion that this would necessarily require that Dr. Bressler testify about the consequences of Ribeiro's eye going unrepaired from August 2004 until the unsuccessful effort at surgical repair in November 2004.  In that regard, the expert's comparison between the August OCT and October OCT would have been of assistance to the jury because it would help establish that it was "more probable"—within the meaning of Rule 401—that Dr. Newman's failure to diagnose Ribeiro with a detached retina in August, and the subsequent passage of time that followed, caused Ribeiro's condition to become irreparable.

Nor do we agree with the trial justice that the potential to confuse the issues and confuse the jury outweighed the probative value of Dr. Bressler's testimony about the October OCT.  Indeed, any concerns that defendants had about possible confusion between Dr. Bressler's testimony concerning causation and Dr. Newman's alleged deviation from the standard of care about which Dr. Greenstein testified should have been allayed by the trial justice's crisp and succinct cautionary instruction.  The trial justice advised the jury:

> "Now, turning to the witness who you will hear from next. The next witness who will be presented by the plaintiff is Dr. Susan Bressler.  Dr. Bressler is an ophthalmologist.  Dr. Bressler has been retained — you will hear testimony that Dr. Bressler has been retained by Mr. Ribeiro to testify in this case.
>
> "An ophthalmologist is a person who has training and experience which is different than the training and experience of Dr. Newman, as well as Dr. Greenstein.  They are optometrists.  There's a difference.  You will hear that there's a difference between optometrists and ophthalmologists.

"Dr. Bressler will be testifying on issues of what the law calls proximate cause; that is, what Mr. Ribeiro's medical condition was and whether the medical condition was the result of a natural, continuous, and unbroken sequence that produced an injury that is involved in this particular matter. Dr. Bressler will not be testifying that anything Dr. Newman either did or did not do deviated or breached the standard of care of an optometrist. Her opinions that she will be offering in this matter are not for that purpose of the standard of care, and you cannot consider her opinions for that purpose.

"The jury will decide whether to accept Dr. Bressler's testimony the same as you do any other witness in this matter, whether that witness is a so-called 'expert witness' or a, what we refer to as a 'lay witness,' and you will decide to give — what weight, what credibility, if any, to give to Dr. Bressler's testimony."

In our view, the trial justice specifically instructed the jury that nothing Dr. Bressler said could be used to evaluate whether Dr. Newman deviated from the standard of care. Not only was this thorough instruction more than adequate, but it is also "well settled that 'the members of the jury are presumed to follow the trial justice's instructions.'" Oden v. Schwartz, 71 A.3d 438, 455 (R.I. 2013) (quoting State v. Clark, 754 A.2d 73, 80 (R.I. 2000)). This, combined with the fact that Dr. Bressler's testimony about the October OCT was not, in our opinion, "enormously prejudicial," convinces us that the trial justice strayed beyond the bounds of his discretion when he excluded that portion of her testimony under Rule 403. See Wells, 635 A.2d at 1193.

We also disagree with the trial justice's conclusion that any error that occurred in precluding Dr. Bressler from testifying about the October OCT and Dr. You's notes was harmless. Doctor Bressler's opinion regarding the October OCT was important both as to her credibility and as a basis for her opinion. Doctor Bressler testified that, had Ribeiro undergone surgery immediately after his first examination in August 2004, his vision would have been restored to an optimal degree, but that deferred treatment allowed the retina to become further

- 18 -

detached and therefore eliminated any prospect for a beneficial result. It is clear from the record that Dr. Bressler reached this conclusion by comparing the August OCT against the October OCT and by reviewing Dr. You's notes. However, in the absence of hearing how she arrived at her conclusion, the jury was not allowed to hear evidence that would have assisted it in evaluating the impact of Dr. Bressler's testimony. We agree with plaintiff that the jury needed to hear Dr. Bressler's interpretation of both test results so it could assess the basis for her opinion that Ribeiro's eyesight would have more likely been repaired in August, but not in October. For these reasons, we are of the opinion that the trial justice's exclusion of Dr. Bressler's testimony was an unsustainable exercise of his discretion and plaintiff is entitled to a new trial on all issues.

**5**

**The Defendants' Motion for Judgment As a Matter of Law**

Under Rule 50, judgment as a matter of law is appropriate if, after viewing the evidence in the light most favorable to plaintiff, the trial justice determines that he did not present legally sufficient evidence to allow the jury to arrive at a verdict in his favor. See McGarry v. Pielech, 47 A.3d 271, 280 (R.I. 2012) (citing Gianquitti v. Atwood Medical Associates, Ltd., 973 A.2d 580, 590 (R.I. 2009)). For their part, defendants argue that the trial justice erred in two ways when he denied their Rule 50 motion. First, they argue that Dr. Greenstein failed to testify that Dr. Newman deviated from the standard of care in interpreting the August OCT results. Second, they argue that the trial justice erred by failing to properly apply the applicable law to the facts of the case.

Whatever the merits of these arguments may be, we will not address them. In Skaling v. Aetna Insurance Co,, 742 A.2d 282, 287 (R.I. 1999), we reaffirmed "our established rule that if one party makes a motion for judgment as a matter of law at the close of the opponent's case and

- 19 -

then presents evidence on his * * * own behalf, the motion must be renewed at the close of all [the] evidence." Failure to do so means "the earlier motion is deemed waived and may not be reviewed." Id. The record is clear that neither defendant renewed the Rule 50 motion at the close of all the evidence; rather, each waited until after the jury returned its verdict to renew the motion for judgment as a matter of law. Because that is insufficient under our well-settled jurisprudence, we will not review its denial on appeal.

**6**

**The Defendants' Motion for a New Trial**

Because we have sustained the plaintiff's appeal and held that he is entitled to a new trial on all issues, we need not, and shall not, rule on the defendants' motion for a new trial on the issue of deviation from the standard of care.

**Conclusion**

For the reasons set forth above, we vacate the decision of the Superior Court. We remand the papers in this case to the Superior Court for a new trial on all issues in accordance with this opinion.



# RHODE ISLAND SUPREME COURT CLERK'S OFFICE

## *Clerk's Office Order/Opinion Cover Sheet*

**TITLE OF CASE:**     Antonio Ribeiro v. The Rhode Island Eye Institute, et al.

**CASE NO:**     No. 2013-297-Appeal.
No. 2013-298-Appeal.
No. 2013-299-Appeal.
(PC 07-4069)

**COURT:**     Supreme Court

**DATE OPINION FILED:**     May 10, 2016

**JUSTICES:**     Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

**WRITTEN BY:**     Associate Justice Francis X. Flaherty

**SOURCE OF APPEAL:**     Providence County Superior Court

**JUDGE FROM LOWER COURT**:

Associate Justice Edward C. Clifton

**ATTORNEYS ON APPEAL:**

For Plaintiff:   Patrick C. Barry, Esq.
Douglas E. Chabot, Esq.

For Defendants:   Paul F. Galamaga, Esq.
Michael G. Sarli, Esq.
Stephen J. Sypole, Esq.